**Opinion issued July 30, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-10-00341-CR

———————————

**CAMERON MOON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1196446**

---

## OPINION

Charged with the delinquent conduct of homicide,[1] sixteen-year-old

Cameron Moon was certified by the juvenile court to stand trial as an adult in

---

[1]     TEX. FAM. CODE ANN. § 51.03(3) (West Supp. 2012) (delinquent conduct); TEX.
PENAL CODE ANN. § 19.03(b)(1) (West 2011) (murder).

Criminal District Court, where a jury convicted him of murder and assessed punishment at thirty years' imprisonment.

On appeal, Moon contends that (1) the juvenile court erred in waiving its jurisdiction and (2) the district court abused its discretion by denying Moon's motion to suppress the statements he made during his interrogation. We vacate the district court's judgment and dismiss the case.

## I.  Background

### A. *EVIDENCE OF THE MURDER*

In July 2008, Deer Park Police Detective Jason Meredith arrived at a grocery store parking lot to investigate a homicide and found Christopher Seabrook dead. Seabrook's cousin, Able Garcia, told the Detective that he and Seabrook had made arrangements to buy a pound of marijuana from a seller whom Garcia knew as "JT." Garcia arrived first, and Seabrook pulled up and parked his truck alongside Garcia's car. The two cousins sat in Garcia's car until a third vehicle, driven by Gabriel Gonzalez, arrived and parked next to Seabrook's truck.

Seabrook approached Gonzalez's car, leaned in the window, and spoke to the front seat passenger. Garcia heard the conversation grow heated, saw Seabrook lunge into the passenger side window, and then heard gunshots. Seabrook then ran from the vehicle but was fired upon by someone who jumped from the passenger

2

side of the car. The shooter, identified by Garcia only as a white male, returned to Gonzalez's car, which sped away.

Gonzalez later returned to the parking lot and admitted to the Detective that he was the driver of the third vehicle, the shooter whom Gonzalez identified as "Crazy" had been seated next to him, and Emmanuel Hernandez was the backseat passenger. Gonzalez recounted that Seabrook pulled Crazy from the car and gunshots were fired. Gonzalez thereafter directed the police to where the shooter lived in La Porte. When recovered by the police, Seabrook's cell phone indicated that the last incoming call was from a phone owned by Moon.

The continued investigation at the parking lot led to the arrest of Hernandez for possession of marijuana and to the discovery of the pistol from which, a ballistic test confirmed, were fired three of the four bullets recovered from Seabrook's corpse.[2] Hernandez identified Moon, who he knew as "J.T.," as the shooter and told the Detective that he and Moon had intended to "jack" Seabrook.[3] Text messages from Moon on Hernandez's cell phone before the shooting asked if he was "ready to hit that lick"[4] and to bring a gun; after the shooting the texts

---

[2]     The fourth bullet was so badly fragmented that tests could not be conducted.

[3]     According to Hernandez, although he and Moon had no marijuana when they met Seabrook, they used the offer to sell to lure Seabrook so they could rob him.

[4]     Detective Meredith testified that to "hit a lick" means to commit a robbery.

3

pleaded "don't say a word" and "tell them my name is Crazy, and you don't know where I live."

Moon later confessed to the shooting, was arrested, taken into custody and two days following the shooting, on July 20, 2008, taken to the Juvenile Detention Center.

## B. EVIDENCE OF MOON'S HISTORY AND BACKGROUND

At the juvenile court hearing on the State's motion to waive jurisdiction held December 17, 2008, Moon's maternal aunt, Jennifer Laban, testified about Moon's family life: his parents divorced when he was very young; when Moon was two-and-a-half years old, his mother gave birth to, suffocated, and threw her newborn daughter into a trash can. After she was convicted of capital murder and sentenced to life without the possibility of parole, Moon never saw his mother again. Moon learned of his mother's history for the first time in 2007, one year before the incident that gives rise to this case.

Moon had been charged with criminal mischief five months earlier for allegedly "keying" another student's vehicle and subsequently went to live with his maternal grandmother, Sharon Van Winkle, in La Porte. As a result of the mischief charge, Moon was compelled to enroll in an alternative school and, Laban testified, began exhibiting anxiety and panic attacks such that she and Van Winkle took Moon to see Tom Winterfeld, a counselor.

4

Mary Guerra, the juvenile probation officer assigned to Moon for the "keying" case, testified that Moon passed all of his classes with no reports of negative behavior at either the alternative school or the detention center's charter school. He successfully completed a program designed to address teen and family relationships, anger management and substance abuse, and was compliant, never angry, always called to check in with her, and was "very cooperative."

Forensic psychiatrist Dr. Seth Silverman[5] testified and submitted his psychiatric evaluation that noted:

> • Moon is mild mannered, polite, and dependent, almost to the point of being fearful, easily influenced, and confused;
>
> • It is this examiner's strong opinion that adult criminal justice programs have few constructive and, possibly, many destructive influences to offer to Moon. There is little to no programming. Therapy, and attempts at rehabilitation, if any, are clearly minimal. Numerous severe, untoward, and aggravating influences are present.
>
> • Moon has little inclination toward violence, does not fit the mold of individuals treated and assessed who have been charged with similar offenses, and he does not appear to be a flight risk or prone to aggressive behavior; and
>
> • Moon's thought process lacks sophistication that is indicative of immaturity.

---

[5] At the time of the hearing, Dr. Silverman had thirteen years' of extensive experience with the juvenile justice system as well as extensive contact with the adult criminal justice system.

Ulysses Galloway, a Harris County probation officer who supervised Moon in the juvenile justice center, described him as "a good kid, young man."[6]  He testified that, in his eleven years as a probation officer, he has seen a lot of kids come and go and "Moon is one of the best kids I have seen come through . . . ."  Galloway also testified that Moon followed his orders, attended classes, was neither aggressive nor mean-spirited, and he considered Moon amenable to treatment.  Two other Harris County probation officers who supervised Moon—Warren Broadnaz and Michael Merrit—testified that their observations of Moon were exactly the same as Galloway's.

Julie Daugherty, the mother of Moon's former girlfriend, described Moon as extremely polite and respectful.  Leslie Wood, Moon's childhood friend, testified that she had never seen Moon become aggressive.

On December 18, 2008, the juvenile court granted the State's motion to waive jurisdiction and transferred Moon's case to the 178th District Court.  On April 19, 2010, a jury convicted Moon of murder and assessed punishment at thirty years' imprisonment.  Moon timely filed this appeal.

## II.    WAIVER OF JURISDICTION

Moon's first issue contends that the juvenile court erred in waiving jurisdiction.  Specifically, he argues that the juvenile court abused its discretion

---

[6]    Galloway approached Moon's counsel on his own initiative and offered to testify on Moon's behalf.

because (1) it failed to provide a specific statement of its reasons for waiver or to certify its fact findings; (2) it misunderstood and misapplied the factors it was required to consider in deciding whether to waive jurisdiction; (3) its finding related to Moon's sophistication and maturity was unsupported by the evidence; (4) its finding related to adequate protection of the public and likelihood of rehabilitation was unsupported by the evidence; and (5) it based its decision on factors that are not proper considerations in the waiver analysis. The State maintains that the juvenile court followed proper procedure in reaching its decision and that the evidence supported the court's findings.

A. STANDARD OF REVIEW

An appellate court reviews a juvenile court's decision to certify a juvenile defendant as an adult and transfer the proceedings to criminal court under an abuse of discretion standard. *State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd); *Faisst v. State*, 105 S.W.3d 8, 12 (Tex. App.—Tyler 2003, no pet.). Absent an abuse of discretion, the appellate court will not disturb a trial court's transfer and certification order. *Faisst*, 105 S.W.3d at 12 (citing *C.M. v. State*, 884 S.W.2d 562, 563 (Tex. App.—San Antonio 1994, no writ)). Relevant factors to be considered when determining if the court abused its discretion include legal and factual sufficiency of the evidence. *In re K.B.H.*, 913 S.W.2d 684, 688 (Tex. App.—Texarkana 1995, no pet.).

7

A trial court's findings of fact are reviewed by the same standards applicable generally to legal and factual sufficiency review: if an appellate court finds the evidence factually or legally insufficient to support the juvenile court's order transferring jurisdiction of a youth to the criminal district court, it will necessarily find the juvenile judge has abused his discretion. *In re G.F.O.*, 874 S.W.2d 729, 731–32 (Tex. App.—Houston [1st Dist.] 1994, no writ). Under a legal sufficiency challenge, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005); *Faisst*, 105 S.W.3d at 12. If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Faisst*, 105 S.W.3d at 12. Under a factual sufficiency challenge, we consider all of the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *See id.*

## B. APPLICABLE LAW

In *Kent v. United States*, 383 U.S. 541 (1966), the United States Supreme Court stated that "[i]t is clear beyond dispute that the waiver of jurisdiction is a 'critically important' action determining vitally important statutory rights of the juvenile." *Id*. at 556. The Court characterized the "decision as to waiver of jurisdiction and transfer of the matter to the District Court [as] potentially as

8

important to petitioner as the difference between five years imprisonment and a death sentence." *Id.* at 557. In *Hidalgo v. State*, 983 S.W.2d 746 (Tex. Crim. App. 1999), the Court of Criminal Appeals likewise recognized that "transfer to criminal district court for adult prosecution is 'the single most serious act the juvenile court can perform . . . because once waiver of jurisdiction occurs, the child loses all protective and rehabilitative possibilities available.'" *Id.* at 755. The *Hidalgo* Court noted that "transfer was intended to be used only in exceptional cases" and that "[t]he philosophy was that, whenever possible, children 'should be protected and rehabilitated rather than subjected to the harshness of the criminal system' because 'children, all children are worth redeeming.'" *Id.* at 754 (citation omitted).

Section 54.02 of the Family Code authorizes a juvenile court to waive its exclusive, original jurisdiction and to transfer a child to a criminal district court if:

(1) the child is alleged to have committed a felony;

(2) the child was fourteen years or older if the alleged offense is a first degree felony or fifteen years or older if the alleged offense is a second degree felony;[7] and

(3) after a full investigation and hearing, the juvenile court determines that there is probable cause to believe that the juvenile committed the offense alleged and that because of the seriousness of the offense alleged or the background of the juvenile, the welfare of the community requires criminal proceedings.

---

[7] Other criteria may satisfy this prong of the statute, but they are not applicable in this case.

9

TEX. FAM. CODE ANN. § 54.02(a) (West Supp. 2012).[8]

To limit the juvenile court's discretion in making the waiver determination, the Supreme Court in *Kent* set out a series of factors for juvenile courts to consider. *Hidalgo*, 983 S.W.2d at 754 (citing *Kent*, 383 U.S. at 566–67). These factors are incorporated into section 54.02(f), which provides as follows:

> (f) In making the determination required by Subsection (a) of this section, the court shall consider, among other matters:
>
> > (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
> >
> > (2) the sophistication and maturity of the child;
> >
> > (3) the record and previous history of the child; and
> >
> > (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

TEX. FAM. CODE ANN. § 54.02(f). The juvenile court "may order a transfer on the strength of any combination of the criteria" listed in subsection (f). *Hidalgo*, 983

---

[8] Before 1995, the Family Code authorized civil appeals from an order "respecting transfer of the child to a criminal court for prosecution as an adult." In 1995, the legislature deleted former Family Code section 56.01(c)(1)(A), which had allowed a civil appeal from an order waiving jurisdiction. *See* Act of May 27, 1995, 74th Leg., R.S., ch. 262, § 48, 1995 Tex. Gen. Laws 2517, 2546. In the absence of a statute allowing an appeal, the result was that the waiver-of-jurisdiction order could only be appealed as in criminal cases generally, *i.e.*, after final conviction in the criminal court. *See Apolinar v. State*, 820 S.W.2d 792, 793 (Tex. Crim. App. 1991).

S.W.2d at 754 n.16 (citing *United States v. Doe*, 871 F.2d 1248, 1254–55 (5th Cir.), *cert. denied*, 493 U.S. 917 (1989)).

Section 54.02(d) requires that, prior to the hearing on the motion to transfer, the juvenile court "shall order and obtain a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense." TEX. FAM. CODE ANN. § 54.02(d). If the juvenile court waives jurisdiction, it must "state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court . . . ." *Id.* § 54.02(h). Rigid adherence to these requirements is mandatory before a court may waive its jurisdiction over a juvenile. *In re J.R.C.*, 522 S.W.2d 579, 582–83 (Tex. Civ. App.—Texarkana 1975, writ ref'd n.r.e.); *see also In re J.T.H.*, 779 S.W.2d 954, 960 (Tex. App.—Austin 1989, no pet.).

## C. JUVENILE COURT'S ORDER

In its Order to Waive Jurisdiction, the juvenile court found that "because of the seriousness of the OFFENSE, the welfare of the community requires criminal proceeding." TEX. FAM. CODE ANN. § 54.02(a)(3).[9] The juvenile court noted that,

---

[9] Here, it is undisputed that the first two prongs of section 54.02(a) are satisfied: the State charged Moon with murder, a first degree felony, and Moon was sixteen years old at the time of the alleged offense. *See* TEX. FAM. CODE ANN. § 54.02(a), (b) (West Supp. 2012).

11

in making that determination, it had considered the four factors enumerated in section 54.02(f), among other matters. The court concluded as follows:

> The Court specifically finds that the said **CAMERON MOON** is of sufficient sophistication and maturity to have intelligently, knowingly and voluntarily waived all constitutional rights heretofore waived by the said **CAMERON MOON**, to have aided in the preparation of HIS defense and to be responsible for HIS conduct; that the OFFENSE allege[d] to have been committed WAS against the person of another; and the evidence and reports heretofore presented to the court demonstrate to the court that there is little, if any, prospect of adequate protection of the public and likelihood of reasonable rehabilitation of the said **CAMERON MOON** by use of procedures, services, and facilities currently available to the Juvenile Court.

Thus, the juvenile court found that waiver of its jurisdiction was supported by the first, second, and fourth factors under section 54.02(f).[10]

## D. *"SOPHISTICATION AND MATURITY"*

Moon's argument regarding the court's "sophistication and maturity" finding is two-fold. First, he argues that the juvenile court misunderstood and misapplied this factor. Second, he contends that the evidence does not support the court's finding. The State contends that the juvenile court applied the proper approach in making its determination regarding Moon's sophistication and

---

[10] Absent a finding regarding the third factor—Moon's record and previous history—we presume that the juvenile court did not find that this factor supported waiver. *See* TEX. FAM. CODE ANN. § 54.02(h); *Hidalgo*, 983 S.W.2d at 754 n.16 ("Should the juvenile court decide to waive its exclusive jurisdiction, the court is required to state in its order the specific reasons for waiver.").

12

maturity, and that the evidence was sufficient to support the juvenile court's finding on this factor.

### 1. PROPER STANDARD

Moon argues that the proper standard for considering the sophistication and maturity prong is not whether he was sophisticated and mature enough to waive his constitutional rights or to assist in the preparation of his defense, as the juvenile court found. Rather, he argues, this factor relates only to the question of culpability and criminal sophistication. In support of his argument, Moon relies on *R.E.M. v. State*, 541 S.W.2d 841 (Tex. Civ. App.—San Antonio 1976, writ ref'd n.r.e.) and *Hidalgo v. State*, 983 S.W.2d 746 (Tex. Crim. App. 1999).

In *R.E.M.*, the defendant sought reversal of the juvenile court's order transferring the murder charge against him to district court. *See R.E.M.*, 541 S.W.2d at 843. With regard to the juvenile court's finding that the defendant was of "sufficient sophistication and maturity to have intelligently, knowingly, and voluntarily waived all constitutional and statutory rights heretofore waived," the appeals court stated

> This finding is somewhat difficult to understand. We believe that the requirement that the juvenile court consider the maturity and sophistication of the child refers to the question of culpability and responsibility for his conduct, and is not restricted to a consideration of whether he can intelligently waive rights and assist in the preparation of his defense.

*Id.* at 846.

13

In *Hidalgo*, the appellant challenged his transfer from juvenile court on the ground that he had been denied his right to assistance of counsel because his appointed attorney had not been notified of a psychological examination until after the exam had taken place. *See Hidalgo*, 986 S.W.2d at 747–48. In examining the purpose of the transfer mechanism, the Court noted

> State legislatures originally devised the process as a means of removing serious or persistent juvenile offenders generally not amenable to rehabilitation to the adult criminal system. The presence of such juveniles was seen as a threat to the fundamental structure of the juvenile system and the less *criminally sophisticated*. [Footnote omitted]. Transfer was intended to be used only in exceptional cases.

*Id.* at 754 (emphasis added).

Based on the above-quoted language, Moon urges us to conclude that the sophistication and maturity element relates only to his culpability and criminal sophistication, and not to an ability to waive his rights or aid in the preparation of his defense. We decline the invitation. Although the *R.E.M.* court believed that the sophistication and maturity factor referred to the question of culpability, it also stated that it was "*not restricted* to a consideration of whether he can intelligently waive rights and assist in the preparation of his defense." *R.E.M.*, 541 S.W.2d at 846 (emphasis added).[11] With regard to *Hidalgo*, we do not read the Court's

---

[11] Several courts after *Hidalgo* have concluded, albeit in unpublished decisions, that a juvenile's ability to waive his rights and assist in the preparation of his defense bear on the question of his sophistication and maturity. *See Jiminez v. State*, No. 13–99–776–CR, 2002 WL 228794, at *8 (Tex. App.—Corpus Christi 2002, pet.

14

explanation of the purpose behind transfer—to remove serious or persistent offenders who were considered a threat to the less criminally sophisticated in the juvenile system—as a restriction on what the court may consider in determining a juvenile's sophistication and maturity under subsection (f). We conclude that the juvenile court did not err in considering Moon's ability to waive his rights and assist in the preparation of his defense.

## 2. EVIDENCE OF SOPHISTICATION AND MATURITY

Moon contends that the juvenile court's finding as to his sophistication and maturity is unsupported by the evidence.

Pointing to Moon's text messages instructing Hernandez to not "say a word," "[t]ell them my name is Crazy, and you don't know where I live," and to the exculpatory stories Moon told Detective Meredith before confessing to the shooting, the State's brief argues that Moon's efforts to conceal the crime and avoid apprehension demonstrate that he knew the difference between right and

---

ref'd) (not designated for publication) (finding juvenile was sufficiently sophisticated and mature to understand adult criminal proceedings and to assist in preparation of his defense); *see also In re B.T.*, 323 S.W.3d 158, 161 (Tex. 2010) (noting one court of appeals's description of "complete diagnostic study" as one that "bears upon the maturity and sophistication of the child and relates to the questions of culpability, responsibility for conduct, and ability to waive rights intelligently and assist in the preparation of a defense"); *Acevedo v. State*, No. 05–08–00467–CR, 2009 WL 930347, at \*2 (Tex. App.—Dallas 2009, no pet.) (finding statutory requirement of complete diagnostic study bears upon juvenile's maturity and sophistication and relates to questions of culpability, responsibility for conduct, and ability to waive rights intelligently and assist in preparation of defense).

15

wrong and that his conduct was wrong. The finding of the juvenile court on the sophistication and maturity issue, however, was based on Moon's ability to waive his rights and assist counsel in preparing his defense, not an appreciation of the nature of his actions or that his conduct was wrong. Moon's text messages and exculpatory stories constitute no evidence supporting the juvenile court's finding that Moon was sufficiently sophisticated and mature to waive his rights and assist in preparing his defense.

In *Hidalgo*, the Court of Criminal Appeals noted that a psychological examination is ordinarily required to assist the court in assessing a juvenile's sophistication, maturity, and the likelihood of rehabilitation as required by subsection(f).[12] In his psychiatric evaluation report, Dr. Silverman concluded that Moon "has a lack of sophistication and maturity" and that his "thought process lacks sophistication which is indicative of immaturity." Dr. Silverman also found Moon to be "mild mannered, polite, and dependent almost to the point of being

---

[12] The *Hidalgo* Court stated

> To assist the court in assessing these factors, the law requires a psychological examination by a doctor with specialized training in adolescent psychology and forensic assessment [citation omitted]. The exam provides insight on the juvenile's sophistication, maturity, potential for rehabilitation, decision-making ability, metacognitive skills, psychological development, and other sociological and cultural factors.

*Hidalgo*, 983 S.W.2d at 754.

fearful, easily influenced and confused." The State presented no controverting expert testimony to undermine Dr. Silverman's conclusion regarding Moon's lack of sophistication and his immaturity.

The State correctly asserts that as the sole judge of credibility, the juvenile court was entitled to disbelieve Dr. Silverman's testimony that Moon lacked sophistication and maturity. *See In re D.W.L.*, 828 S.W.2d 520, 525 (Tex. App.— Houston [14th Dist.] 1992, no pet.) (noting juvenile court is sole fact-finder in pretrial hearing and may choose to believe or disbelieve any or all of witnesses' testimony). Nonetheless, there must be some evidence to support the juvenile court's finding that Moon was sufficiently sophisticated and mature for the reasons specified by the court in order to uphold its waiver determination. Our review finds no evidence supportive of the court's finding that Moon was "of sufficient sophistication and maturity to have intelligently, knowingly and voluntarily waived all constitutional rights heretofore waived . . . [and] to have aided in the preparation of [his] defense." As such, the evidence to uphold the juvenile court's finding regarding Moon's sophistication and maturity is legally insufficient.

## E. PROTECTION OF THE PUBLIC AND REHABILITATION OF THE JUVENILE

Moon next contends that the evidence adduced is insufficient to support the court's finding that

> "there is little, if any, prospect of adequate protection of the public
> and likelihood of reasonable rehabilitation of [Moon] by use of

procedures, services, and facilities currently available to the Juvenile Court."

The State contends that the evidence regarding this factor is sufficient to support the court's finding and asserts that the juvenile court does not abuse its discretion by finding that the community's welfare requires transfer due to the seriousness of the crime alone, despite the juvenile's background. Pointing to the offense itself and the evidence showing that it was committed during a drug transaction and that Moon repeatedly shot Seabrook while he fled, the State concludes, "based on the seriousness of the offense alone, the evidence sufficiently demonstrated that appellant's transfer was consistent with the public's need for protection."

The State conflates subsections (a)(3) and (f). Subsection (a)(3) authorizes the juvenile court to waive jurisdiction if it determines that "because of the seriousness of the offense alleged *or* the background of the juvenile, the welfare of the community requires criminal proceedings." TEX. FAM. CODE ANN. § 54.02(a) (emphasis added). Thus, a juvenile court can properly find that the welfare of the community requires criminal proceedings because of the seriousness of the offense, the background of the individual, or both. *See id.* However, a finding based on the seriousness of the offense under subsection (a) does not absolve the juvenile court of its duty to consider the subsection (f) factors. If, as the State argues, the nature of the offense alone justified waiver, transfer would

18

automatically be authorized in certain classes of "serious" crimes such as murder, and the subsection (f) factors would be rendered superfluous. *See R.E.M.*, 541 S.W.2d at 846 ("We find nothing in the statute which suggests that a child may be deprived of the benefits of our juvenile court system merely because the crime with which he is charged is a 'serious' crime."). Further, the cases relied on by the State do not suggest that the nature of the crime alone can support waiver; rather, they merely make the observation that subsection (a)(3) is written in the disjunctive. *See McKaine v. State*, 170 S.W.3d 285, 291 (Tex. App.—Corpus Christi 2005, no pet.) (noting that because § 54.02(a)(3) is disjunctive, "[e]ven if we were to sustain McKaine's challenge regarding his background, his failure to challenge the court's finding regarding the seriousness of the offense would preclude relief."); *In re D.D.*, 938 S.W.2d 172, 177 (Tex. App.—Fort Worth 1996, no writ) ("The second element, however, is not written in the conjunctive. It requires only that the trial court find that the seriousness of the offense or the background of the child requires criminal prosecution to protect the welfare of the community.").

## I. EVIDENCE RELATED TO PROTECTION OF THE PUBLIC

The record reflects that Moon had a sole misdemeanor conviction for "keying" a car, and while locked up in the juvenile facility was accused of four infractions.[13] The probation report provides no details.

In his psychiatric evaluation report, Dr. Silverman stated that Moon "has little inclination towards violence," "does not fit the mold of individuals treated and assessed who have been charged with similar offenses," and "does not appear to be a flight risk or prone to aggressive behavior." Dr. Silverman found Moon "especially when compared to other individuals with similar [alleged] aggressive behavior who have been treated by this psychiatrist—to be mild mannered, polite, and dependent, almost to the point of being fearful, easily influenced and confused." In his report, Dr. Silverman also referenced the notes of Moon's therapist, Tom Winterfeld, stating that Moon showed no signs of aggression. Dr. Silverman concluded that Moon "is at little risk to . . . harm himself or others." Moon's juvenile probation officers described Moon as "very cooperative" and compliant, never angry, "a good kid, young man," "one of the best kids I have seen come through," and neither "aggressive nor mean-spirited." Daugherty, the mother of Moon's former girlfriend, described him as "an extremely polite young

---

[13] Moon was convicted of "mischief—$500/$1499.00 Property Damage" for keying a car on school grounds. The infractions at the juvenile facility consisted of two attempted physical altercations, one physical altercation, and one related to contraband.

man" and "very respectful." Wood, Moon's childhood friend, testified that she had never seen him become aggressive.

## II. EVIDENCE OF LIKELIHOOD OF REHABILITATION

Dr. Silverman noted that "[p]rior to the alleged offense, Moon had been subject to multiple significant psychosocial stressors, including but not limited to, a change of caretakers, custody battle between caretakers, and placement in an alternative school. He had also learned the reason that he had never had contact with his biological mother—she was incarcerated for life because she had killed her newborn after delivering at home and then place[d] it in a garbage dumpster." Dr. Silverman stated "[i]t is this examiner's strong opinion that adult criminal justice programs have few constructive, and possibly many destructive, influences to offer [] Moon. There is little to no programming. Therapy and attempts at rehabilitation, if any, are clearly minimal. . . . Moon, in the opinion of this forensic psychiatrist, might be harmed by placement in an adult criminal justice jail due to its untoward influences and lack of rehabilitative intent." Dr. Silverman concluded that Moon "would probably benefit from placement in a therapeutic environment specifically designed for adolescent offenders, especially one licensed by, and contracted with, the Texas Youth Commission." His conclusion comported with Winterfeld's therapy notes indicating that Moon had responded to psychological

therapy. Officer Galloway, Moon's juvenile probation officer, also testified that he considered Moon amenable to treatment.

Construing the prior "keying," juvenile facility infractions, and the nature of the charged offense as more than a scintilla of evidence and considering only this favorable evidence to support the court's finding, we must conclude the evidence to be legally sufficient to support the court's determination that "there is little, if any, prospect of adequate protection of the public and likelihood of reasonable rehabilitation of [Moon] by use of procedures, services, and facilities currently available to the Juvenile Court." However, careful consideration of all of the evidence presented further compels the conclusion that the evidence is factually insufficient to support the juvenile court's finding. As to the protection of the public, Moon's keying a car is not only a non-violent act, it is an undeniably low-level misdemeanor mischief offense against property—hardly the sort of offense for which "there is little, if any, prospect of adequate protection of the public and likelihood of reasonable rehabilitation . . . by use of procedures, services, and facilities currently available to the Juvenile Court." Further, the probation report offers no details regarding Moon's "write-ups" at the resident juvenile facility. Indeed, Moon's juvenile detention officers, presumably in a position to observe such incidents, uniformly testified that Moon "was one of the best kids I have seen

22

come through," that he followed orders, attended classes, and was not aggressive or mean-spirited.

The State relies only on the juvenile court's conclusion that, "due to appellant's age, the juvenile system would not have authority over appellant long enough to rehabilitate him." Such a conclusion, of course, is not evidence, and there is nothing in the record supporting this conclusion.[14] Further, the State's reliance on *Faisst* is misplaced. *See* 105 S.W.3d at 12–13, 15. There, the appeals court found the evidence sufficient to support the juvenile court's finding that the juvenile system could not adequately provide for the defendant's rehabilitation because the offense of intoxication manslaughter required a longer period of supervision and probation than was available under the juvenile system. *See Faisst*, 105 S.W.3d at 15. However, there was specific testimony that (1) in the juvenile system the maximum punishment is twelve months of intensive supervision followed by twelve months of probation, (2) the defendant had a "significant problem with alcohol abuse," and (3) such a "person needs a minimum of fifteen to twenty months of supervision to ensure that rehabilitation takes place." *See id.* at 12. The record here has no such evidence. Indeed, the only evidence regarding the likelihood of Moon's rehabilitation was the uncontroverted

---

[14]  This conclusion is particularly noteworthy in light of the juvenile court's oral finding at the conclusion of the hearing that "the court does not know of any, in terms of the services, facilities and procedures in the juvenile system."

23

testimony that Moon was amenable to treatment. Consequently, we conclude that the juvenile court's finding that "there is little, if any, prospect of adequate protection of the public and likelihood of reasonable rehabilitation of [Moon] by use of procedures, services, and facilities currently available to the Juvenile Court" was so against the great weight and preponderance of the evidence as to be manifestly unjust.

In sum, we find the evidence legally insufficient to support the juvenile court's finding related to Moon's sophistication and maturity. We also find the evidence factually insufficient to support the court's finding regarding the prospect of adequate protection of the public and the likelihood of Moon's rehabilitation. Thus, the first factor—whether the offense was against person or property—is the only factor weighing in favor of Moon's transfer.[15] Under these circumstances, we hold that the juvenile court abused its discretion when it certified Moon as an adult and transferred his case to the district court.[16]

### III. Conclusion

Because the juvenile court abused its discretion in waiving its jurisdiction over Moon and certifying him for trial as an adult, the district court lacked

---

[15] As previously noted, the juvenile court did not specify Moon's record and previous history as a reason supporting its waiver decision.

[16] In light of our disposition of Moon's first issue, we do not reach his second issue complaining of the district court's denial of his motion to suppress.

jurisdiction over this case. We therefore vacate the district court's judgment and dismiss the case. The case remains pending in the juvenile court.

Jim Sharp
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

Publish. TEX. R. APP. P. 47.2(b).