

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00353-CV

———————————————

IN THE MATTER OF T.S.

———————————————

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-113960-20

———————————————

Before Kerr, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

T.S.[1] appeals from a juvenile-court order waiving jurisdiction and transferring him to the criminal district court to be tried as an adult for one count of capital murder, two counts of first-degree murder, and one count of first-degree aggravated robbery. In one issue, T.S. argues that the trial court abused its discretion by waiving its jurisdiction "because it acted without reference to any guiding rules or principles." Because the juvenile court did not reversibly err, we affirm.

### II. BACKGROUND

According to the State's transfer petition, when T.S. was fifteen years old or older, he was involved in an aggravated robbery on March 5, 2020, that ended in the murder of Terry Tyrone Ross, Jr. On September 29, 2020, the juvenile court held a hearing to consider the State's petition. At the time of the hearing, T.S. was seventeen years old.

On October 22, 2020, the juvenile court entered its "Waiver of Jurisdiction and Order of Transfer to a Criminal District Court." In the order, the court made these pertinent findings:

- The Court finds that the acts alleged in Paragraph I are a Capital felony, and the acts alleged in Paragraphs II, III, and IV [are]

---

[1]We use aliases or initials to refer to T.S. and select witnesses to protect the identities of minors. *See* Tex. R. App. P. 9.10(a)(3).

2

felonies of the First Degree under the penal laws of the State of Texas if committed by an adult.[2]

- The Court finds that the offenses alleged in Paragraphs I, II, III, and IV were against the person of another, namely victim Terry Tyrone Ross.

- The Court finds that there is probable cause to believe that the Respondent committed the offenses alleged in Paragraphs I, II, Ill, and IV of the Petition on file in this cause.

- The Court finds that the Respondent is of sufficient sophistication and maturity to be tried as an adult.

- The Court further finds that the likelihood of reasonable rehabilitation of the Respondent by the use of procedures, services, and facilities currently available to the Juvenile Court is low and, after considering all of the testimony, exhibits, diagnostic study, social evaluation, and full investigation, finds that it is contrary to the best interests of the public to retain jurisdiction.

- The Court finds that because of the seriousness of the alleged offenses and the background of the Respondent, the welfare of the community requires criminal proceedings.

The court further stated in its order that in making its determination, it had considered

- whether the alleged offenses were against person[s] or property, with the greater weight in favor given to the offense against the person;

- the sophistication and maturity of the child;

---

[2]These findings are verbatim from the trial court's order. Paragraphs I, II, III, and IV refer to the State's four allegations of one count of capital murder, two counts of murder, and one count of aggravated robbery.

- the record and previous history of the child; and

- the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use of procedures, services, and facilities currently available to the Juvenile Court.

The juvenile court also stated that it had based its findings on evidence presented by the State in support of its petition, including evidence of T.S.'s extensive and escalating criminal history, evidence showing that T.S. would not benefit from services afforded through the juvenile justice system, and prior intervention failures by T.S. during his time in the juvenile justice system. This appeal followed.

## III. DISCUSSION

In one issue, T.S. argues that the trial court abused its discretion by waiving jurisdiction "because it acted without reference to any guiding rules or principles." Specifically, T.S. argues that the evidence is insufficient to support the juvenile court's finding that T.S. would not benefit from the services of the juvenile system. The State counters that the evidence supports the trial court's determination that "T.S.'s rehabilitation is unlikely through the use of the services available through the juvenile system." Thus, the State argues, the trial court did not abuse its discretion by waiving jurisdiction. We agree with the State.

## A. Waiver of Juvenile Jurisdiction

Juveniles are not ordinarily subject to criminal proceedings. *In re S.G.R.*, 496 S.W.3d 235, 238 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Instead,

4

juvenile courts have exclusive original jurisdiction over cases involving offenses committed by juveniles between ten and seventeen years of age. Tex. Fam. Code Ann. §§ 51.02(2)(a), 51.03(a)(1), 51.04(a). If, however, a juvenile court finds after an evidentiary hearing that certain conditions are met, it may waive its jurisdiction and transfer a juvenile to the appropriate district court or criminal district court for criminal proceedings. *Id.* § 54.02(a), (c).

Two standards for the waiver of juvenile jurisdiction exist: one for juveniles under eighteen years of age and another for those who have reached the age of eighteen since the commission of the alleged offense. *In re H.Y.*, 512 S.W.3d 467, 476 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Because T.S. was seventeen at the time of the certification hearing, the former standard applies.

Under this standard, transferring a juvenile charged with a first-degree felony, like murder, to the appropriate district court requires the juvenile court to find

- the juvenile was fourteen years of age or older at the time of the alleged offense;

- probable cause to believe the juvenile committed the offense exists; and

- the alleged offense's seriousness or the juvenile's background requires criminal rather than juvenile proceedings.

Tex. Fam. Code. Ann. § 54.02(a). In deciding whether a preponderance of the evidence supports the third requirement, the juvenile court must consider four factors:

(1)  whether the alleged offense was against a person or property, with the former weighing more heavily in favor of transfer;

(2)  the sophistication and maturity of the juvenile;

(3)  the record and previous history of the juvenile; and

(4)  the prospects of adequate protection of the public and the likelihood of rehabilitation of the juvenile by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* § 54.02(f).

The juvenile court must consider all four factors under Section 54.02(f), but it need not find that all four factors favor transfer when exercising its discretion to waive jurisdiction. *Moon v. State*, 410 S.W.3d 366, 375 (Tex. App.—Houston [1st Dist.] 2013), *aff'd*, 451 S.W.3d 28 (Tex. Crim. App. 2014).[3] The four factors are not the exclusive factors to consider but nevertheless are factors that must be considered. *Id.*; *In re C.A.P.*, 582 S.W.3d 504, 508 (Tex. App.—Waco 2018, pet. denied). A juvenile court that waives its jurisdiction must enter a written order in which it

---

[3]We note that the Court of Criminal Appeals's decision in *Moon*, which is considered to be the seminal case in juvenile waiver proceedings, was based on an appeal from a conviction pursuant to Article 44.47 of the Code of Criminal Procedure. In 2015, the Legislature repealed Article 44.47 and added Family Code Section 56.01(c)(1)(A) to allow an appeal directly from the order waiving jurisdiction. *See* Act of May 12, 2015, 84th Leg., R.S., ch. 74, 2015 Tex. Gen. Laws 1065, 1065. Because of this change, an appeal of our decision will no longer be considered by the Court of Criminal Appeals but by the Texas Supreme Court, which has jurisdiction over juvenile appeals. The Texas Supreme Court has not addressed the method of analysis and review as explained in *Moon*; therefore, our analysis will follow the established precedent of the Court of Criminal Appeals.

specifically states its reasons for waiver and its findings. Tex. Fam. Code. Ann. § 54.02(h).

## B. Standard of Review

We review a juvenile court's fact findings in support of a transfer decision under traditional evidentiary-sufficiency principles. *Moon*, 451 S.W.3d at 41. In a legal-sufficiency review, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable factfinder could not. *In re J.W.W.*, 507 S.W.3d 408, 413 (Tex. App.—Houston [1st Dist.] 2016, no pet.). If more than a scintilla of evidence supports a finding, the evidence is legally sufficient. *Id.* In a factual-sufficiency review, we consider all the evidence to determine whether the juvenile court's findings are so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

Because the juvenile court sits as factfinder and evaluates the witnesses in person, it is the sole judge of their credibility. *Moon*, 410 S.W.3d at 375. The juvenile court can choose to believe or disbelieve a witness's testimony in whole or part, including an expert witness's testimony. *S.G.R.*, 496 S.W.3d at 238. As factfinder, the juvenile court weighs the evidence and resolves any inconsistencies. *In re T.S.*, 548 S.W.3d 711, 730 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

If the evidence is legally and factually sufficient to support the juvenile court's findings, then we review its ultimate waiver decision for abuse of discretion. *See id.* at 725, 730–31. The question is not whether we would have decided the issue

7

differently. *See id.* at 721–22, 725. Instead, we consider whether the juvenile court's waiver was arbitrary or made without reference to the statutory criteria. *See id.* at 731. If the juvenile court correctly applies these statutory criteria and specifically states its supporting findings, its waiver decision generally will satisfy our review for abuse of discretion. *Id.* at 722.

## C. Applicable Facts

### 1. Detective Ernie Pate

At the transfer hearing, Detective Ernie Pate of the Fort Worth Police Department's violent personal crimes section of the homicide unit testified that he was dispatched to a shooting incident on March 5, 2020, at the Oak Tree Apartments in Fort Worth. Pate said that he became involved because the victim of the shooting, Ross, had passed away shortly after being transported to the hospital by officers who had originally responded to a shooting dispatch. When Pate arrived, he spoke with another officer who was already at the scene and learned there were witnesses to the shooting who were available to talk. While other officers talked with some of the witnesses, Pate said that he spoke with eyewitness Kenny Patterson.

Pate later reviewed the other officers' interoffice correspondence from which he learned what Patterson and another eyewitness, Kristie LaRue, had said to the other officers about the shooting. Pate described LaRue's and Patterson's observations from that day as "very similar." According to Pate, LaRue and Patterson both said that they had seen three black males arguing and then they heard a gunshot.

8

LaRue and Patterson then saw two of the men pick up the third man and carry him from the interior of the apartments' gate to the area outside of the gate and onto the sidewalk.

In addition to discovering what the eyewitnesses had seen, Pate found a "fired .40 caliber shell casing and one [spent] projectile that was just inside the gate." He also found a pair of eyeglasses that appeared to belong to Ross and what Pate believed to be two blood stains, one inside the gate and the other outside the gate. By Pate's account, it appeared that Ross's body had been moved from inside the gate to outside the gate after he had been shot.

Pate obtained video surveillance footage from two cameras, one owned by the city and the other by the Oak Tree Apartments. Pate said that the footage showed two suspects running from the scene just after the shooting. The two suspects ran into the breezeway of the nearby Marabella Apartments. Other footage showed a black male "wearing the same exact clothes as [one of] the persons" seen fleeing to the Marabella Apartments earlier in the day. Pate showed stills of the footage to the Marabella Apartments' manager, who told Pate that she recognized one of the men.[4] Further investigation led Pate to discover that one of the suspects, Anthony Hall,

---

[4]Originally, the manager told Pate that the individual's name was "Antwon Reed," but Pate later learned that the person the manager identified by the wrong name was "Anthony Hall."

lived in the Marabella Apartments. Pate questioned Hall, viewed some Instagram posts, and learned that T.S. was the other suspect.

According to Pate, through Instagram posts, he learned that one of T.S.'s friends, Monty, said that T.S. had admitted to being involved in the murder. While on the stand, Pate also read some of T.S.'s and Monty's Instagram messages wherein T.S. wrote "We got inna a argument." Monty responded, "Damn u can't beat it that's attempted murder if u let off one shot." T.S. replied, "T die bro." Pate said that he learned through his investigation that Ross was referred to as "T."

Pate also interviewed Monty and Clara, T.S.'s girlfriend, during his investigation. According to Pate, Monty shared with Pate details T.S. had told Monty that at the time were not known to the public. And prior to the shooting, Monty overheard T.S. on the phone saying to Clara, "[W]e're about to do something dumb." Later, T.S. and Hall went to Monty and Clara's apartment and brought with them a black duffel bag containing guns and marijuana. Surveillance footage showed T.S. and Hall getting into a car at the Marabella Apartments after the shooting.

Pate interviewed Hall who described how he and T.S. went to Clara's apartment and brought the black duffle bag containing "two guns[ and] a quarter pound of weed" with them. Hall referred to the guns as T.S.'s and Ross's guns, and he implied that the marijuana had belonged to Ross.

Hall also described the shooting to Pate. By Hall's account, he, T.S., and Ross were all in Ross's car outside of the Oak Tree Apartments. While there, T.S. and Ross

10

showed each other their respective guns, and they discussed money, ostensibly related to buying marijuana from Ross. According to Hall, T.S. told Ross that his relative lived in the apartments and that they could get the money from her. The three entered the gate of the Oak Tree Apartments, but Ross became concerned that something was awry. Hall then knocked Ross to the ground, T.S. and Ross began to struggle, Ross allegedly grabbed for his gun, and T.S. shot Ross once. Hall told Pate that, contrary to eyewitness accounts, T.S. alone had moved Ross outside the gate of the apartments.

Pate said that his investigation revealed that T.S. had planned to rob Ross of his marijuana and money and that after the shooting, T.S. took Ross's marijuana, gun, and money. After Hall and T.S. fled to the Marabella Apartments, Hall gave T.S. the black duffle bag. Pate's investigation also demonstrated that prior to the shooting, T.S. was in possession of a Smith & Wesson .40 caliber handgun. Pate said that investigators never recovered the gun but that ballistics on the spent projectile in this case compared to the ballistics on another projectile on file showed that the gun had previously been stolen and then returned to its registered owner. Pate, however, did not know how T.S. came into its possession.

At some point during the investigation, Pate sought and obtained a warrant for T.S.'s arrest for the offense of capital murder. Pate said that the autopsy report regarding Ross stated that Ross's death was caused by a gunshot wound to the chest,

that Ross's body had an exit wound, that no projectile was recovered during the autopsy, and that the manner of death was homicide.

Additionally, Pate testified that he was aware of reports that Hall and T.S. had committed a robbery a few months before the shooting. And Pate said that T.S. was referred to in the streets as "Little Bro."[5]

### 2. Dr. Evan Norton

The deputy director of integrated treatment for the Texas Juvenile Justice Department, Dr. Evan Norton, testified at the hearing. Norton possesses a doctorate of psychology and is a licensed clinical forensic psychologist. Norton said that if T.S. remained in the juvenile system and was found guilty of the charges, he would most likely be placed in the Capital Offender Program at Giddings State School. According to Norton, if T.S. was placed in the program, he would receive daily educational services for half of each day, and the other half of T.S.'s days would be spent in group counseling, skill development, and social skills education. Norton also said that the program has other educational opportunities, work programs, and on-campus activities that T.S. could be involved in if at Giddings. T.S. would also have access to alcohol and drug treatment programs.

---

[5]While Pate was on the stand, the judge asked Pate whether T.S. had a "street name, gang name, [or] do you know?" Pate responded, "[H]e's referred to as Little Bro." However, an Order of Detention sheet in the record contains a checklist which asks whether T.S. is a "known gang member, claims gang affiliation, or associates with gang members." The box is unchecked.

Norton explained that if T.S. committed three major rule violations like fighting or assault while at Giddings, the school would seek to transfer him to the Texas Department of Criminal Justice to serve out any remaining time. Norton said that given T.S.'s age, if he were placed at Giddings, he would not be able to complete even a minimum sentence of three years at the school before he aged out.

### 3. Darron Thomas

Darron Thomas, a juvenile probation officer for Tarrant County Juvenile Services, testified that he had been assigned as T.S.'s probation officer in March 2018. According to Thomas, he was supervising T.S. because of a January 2018 assault-causing-bodily-injury charge.

For the hearing, Thomas prepared a diagnostic report regarding T.S. for the purpose of providing background information and observations that Juvenile Services made throughout its supervision of T.S. Attached to the report were two psychological evaluations of T.S. by different doctors. By Thomas's account, he had between fifty and sixty conversations with T.S. throughout the twenty-four months leading up to the hearing. Thomas said that T.S. does not appear to have any type of mental disability or any communication problems.

Thomas described many sections of the diagnostic report while on the stand. Specifically, Thomas detailed T.S.'s criminal history, which dated back to 2016 when T.S. was arrested for criminal mischief and evading on foot. Later that same year, T.S. was charged with credit card abuse and burglary of a vehicle. Thomas said that T.S.'s

January 2018 assault-causing-bodily-injury charge stemmed from T.S.'s having physically picked up a fellow student at school and slammed him to the ground. Because of that charge, T.S. was placed on one year's probation. According to Thomas, when he first visited T.S. in his home, T.S. had a "tough façade" and there was clear tension in his family's dynamic.

Thomas also described T.S.'s living environment as "very transient" in that T.S. had lived at different places with his sister, mother, uncle, grandmother, and several friends while on probation. By Thomas's account, he "spent a large portion of [his] supervision time with [T.S.] looking for [T.S]." Many times, Thomas could not locate T.S. at school even though terms of his probation required him to attend. Thomas said that T.S. changed schools several times during his probation. At one of these schools, T.S. was involved in an incident, and his probation was extended because he had told a student that he was going to kill a number of people and the news would make him famous. As a result, the school filed a terroristic threat report with the police.

Because T.S. tested positive for marijuana several times, Thomas said that he filed multiple violations for T.S. T.S. was also sent to inpatient treatment at the Phoenix House in Dallas, but he ran away from the facility after only five days. In addition, T.S. absconded twice more during his probation; according to Thomas, T.S. would be gone anywhere from thirty to sixty days during those times. T.S. was ordered to another inpatient treatment facility, but he did not successfully complete

14

treatment. As to other services, Thomas said that T.S. had been referred to the Family Partnership Program twice, but each time T.S.'s family refused to participate.

Regarding T.S.'s increasing criminal activities, Thomas said that T.S. was charged with the offense of unauthorized use of a motor vehicle in December 2019 and failed to appear at the related hearing. In January 2020, T.S. was charged with robbery because he, Hall, and another accomplice had allegedly beat up a fifteen-year-old male and took his shoes, jacket, and phone. Thomas said that he received a referral in March 2020 regarding the capital murder charge—T.S. was still on probation at the time.

According to Thomas, T.S. had never taken responsibility for his actions regardless of the circumstances, and T.S. had not been amenable to the services provided by Juvenile Services. Thomas averred that T.S. had been detained since March 2020 at the juvenile detention center or at the county jail. While in the detention center, T.S. had failed to participate in programs, engaged in peer altercations, and displayed assaultive behavior.[6] Thomas agreed that while T.S. had been on probation with Juvenile Services, his criminal behavior had increased in frequency and severity.

---

[6]Thomas explained that T.S.'s behavior in detention was sporadic. Specifically, Thomas said that although T.S. had achieved what is considered level I status several times, he was at times elevated to level III "for peer altercations, refusal to comply, assaultive behavior, [and] things like that." Even though Thomas discussed levels I, II, and III, he never specifically defined them other than to express that these levels are elevated based upon a juvenile's improper behavior.

Thomas said that T.S. has an IQ of 82, that the doctor that performed one of the psychological evaluations had diagnosed T.S. with borderline intellectual functioning, and that another doctor had recommended long-term inpatient therapy. Further, one of the doctors specifically stated in an evaluation that "evidence suggests that [T.S.] has the cognitive capacity to benefit from conventional modes of treatment such as cognitive-behavioral therapy." And Thomas stated that T.S. had completed some services while on probation and that he also complied with two periods of time when he was required to wear an electronic monitoring device. In all, however, Thomas said that he believed that based on his experience with T.S., T.S. would not be compliant with or amenable to juvenile services.

### 4. Dr. Monica Jeter

Psychologist Dr. Monica Jeter testified that she wrote T.S.'s evaluation report after having conducted a psychological evaluation on him. Jeter said that in forming the report, she reviewed the two doctor's reports attached to Thomas's diagnostic report as well as a report made by a doctor working for T.S.'s defense. As part of her evaluation, Jeter conducted a clinical interview with T.S. Jeter said that T.S. declined to participate in parts of her evaluation, including a risk sophistication[7] treatment inventory. He also did not answer some of her questions, particularly about whether

[7]Jeter described sophistication as an individual's "interaction with the community, the environment[, being] much more . . . elevated[,] . . . . [m]ore adult-like than perhaps someone their age."

16

he had been involved in a gang, had owned a weapon, had stolen things, or had experienced homicidal ideations. Jeter said answers to these questions were important because they would show how sophisticated T.S. was compared to others his age in committing criminal acts and whether T.S. had a potential for violence.

According to Jeter, the fact that T.S. had committed multiple crimes with a person older than T.S. showed that T.S.'s sophistication was more advanced than peers his age. She also said that T.S.'s association with Hall demonstrated that T.S. was "associating himself with people that are doing, at this point, acts that are jeopardizing the community, jeopardizing the safety of the community, and jeopardizing potential people or property."

Like Thomas, Jeter said that in her opinion, T.S.'s propensity to commit offenses was "progressively getting worse" over time despite Juvenile Services' intervention. Jeter also averred that T.S. had a tendency to harm other persons.

Jeter performed a Kaufman Brief Intelligence Test on T.S., but Jeter said that T.S. became increasingly less motivated to answer the questions as the test progressed. Jeter described the Kaufman test as one used to analyze three areas of intelligence: "verbal, nonverbal, and composite IQ." T.S. performed below average on the verbal and nonverbal sections of the test, and Jeter determined his IQ to be 72, which is below the average of 100. Jeter had also reviewed T.S.'s performance on The Wechsler Intelligence Scale for Children that had been performed by another doctor who concluded that T.S.'s IQ was 82. Jeter said the Wechsler test is considered more

17

comprehensive than the Kaufman test. And she averred that T.S.'s lack of motivation to take the Kaufman test coupled with the fact that the Wechsler test is more comprehensive could explain the difference in the two scores.

Jeter also reviewed records indicating that T.S. has a third-grade reading capacity, fourth-grade math ability, and a fifth-grade spelling acumen. She opined that given his IQ of 82, T.S. is in the lower 12% intellectually of people his age. Jeter admitted that in one of the records she reviewed, the other doctor concluded that T.S. was underdeveloped as far as his ability to act purposely, think rationally, and deal effectively with his environment. However, Jeter's ultimate evaluation of T.S. was

> that [T.S.] is not a person that is intellectually disabled. . . . He did not appear to be experiencing anxiety, but he may be experiencing depression related to his current legal problems and family dynamic. He would merit from psychiatric consultation. He appears more sophisticated but not more mature than his same aged peers. He appears capable of understanding the legal implications surrounding a discretionary transfer motion and of assisting his attorney in his defense. It appears the community would be at a high level risk were he to remain in it. [T.S.] would not benefit from services afforded through the juvenile justice system.

When asked why she believed that T.S. would not benefit from the juvenile justice system, Jeter replied, "The level of aggression and the lack of treatment amenability of - - I think he needs treatment, but I don't know that he has the time in the juvenile system to acquire that treatment."

### 5. Dr. Emily Fallis

Psychologist Dr. Emily Fallis testified on T.S.'s behalf. Fallis conducted her own evaluation of T.S. According to Fallis, T.S. experienced a "very bad" childhood, having been exposed to a high level of violence and having never lived in a stable environment. Fallis also said that T.S. demonstrated responses to situations in his life in a "primitive way" and that his actions are of the type "usually associate[d] with a much younger child." She averred that T.S. struggles to put thoughts into words and reach conclusions and that these struggles are a "reflection of the verbal limitations of his brain functioning that are shown in the IQ testing." By Fallis's account, T.S. is less mature and sophisticated than same-aged peers. And, Fallis said, T.S. had emotional limitations that interfered with controlling impulses, recognizing triggers, and learning new ways of acting. Fallis testified that she believed that T.S. would benefit from remaining in Juvenile Services and being placed in a long-term inpatient residential facility.

### 6. T.S.'s Mother

T.S.'s Mother testified that she has five children and that only T.S. had been difficult to raise. According to Mother, T.S. had been hospitalized for at least a week more than once because either he was hearing voices and seeing things or he was acting out and having a lot of problems at school. She also said that he had been prescribed medications in the past. By Mother's account, T.S. did not take advantage of some of the programs at Juvenile Services because doing so would have interfered

with her own employment. Mother testified that while T.S. was on probation, he stayed at a number of relatives' houses because she and T.S. had disagreements and he would not follow rules.

Regarding T.S.'s education, Mother averred that T.S. had never participated in special education, and even though it was recommended to her that he do so, "he was just a nudge over what they accept as special ed." Mother said that T.S. had always had problems in school. Specifically, T.S. would talk a lot, not pay attention, or be disruptive in class. Mother opined that T.S. is less mature than same-aged peers. According to Mother, T.S. is not a violent person. In the end, Mother said that she believed that T.S. would benefit from remaining in the juvenile system and taking advantage of the available programs.

## D. Analysis

T.S. concedes that the trial court made the proper findings based on Family Code Section 54.02(h) and in accordance with *Moon*. Moreover, T.S. does not dispute "that probable cause existed to issue an arrest affidavit." T.S.'s sole challenge is to the sufficiency of the evidence supporting the juvenile court's finding that T.S. would not benefit from the services of the juvenile system. As the State points out, T.S.'s specific argument is that the evidence "clearly established TJJD[8] was the best placement option for T.S."

---

[8]TJJD is common shorthand for the Texas Juvenile Justice Department.

20

We conclude that the evidence is both legally and factually sufficient to support the trial court's finding that T.S. would not benefit from the services of the juvenile system. The trial court in this case had before it multiple witnesses, including Thomas—T.S.'s probation officer—and Jeter—the doctor who evaluated T.S. for the State. Both of these witnesses gave numerous detailed accounts of T.S.'s failing to take advantage of the services provided by the juvenile system, and both witnesses discussed that rather than having been rehabilitated by being in the system, T.S. demonstrated an increasing frequency and severity in the offenses he committed. Moreover, while psychologist Norton testified about the services available to T.S. if he remained in the juvenile system, he also testified that T.S. would not be eligible to serve even a minimum three-year sentence in juvenile services before he aged out. Thus, he would not be able to fully take advantage of those services.

To the contrary, T.S. contends that the trial court had before it evidence that he would benefit from remaining in the juvenile system. Relying heavily on Norton's testimony, T.S. argues that Norton said that T.S. would benefit greatly by being in the Capital Offender Program at Giddings. But as explained above, the trial court also had before it evidence that T.S. would not benefit from remaining in the juvenile system. Indeed, T.S. has had numerous opportunities to utilize the rehabilitative services of the juvenile system and has failed to use them. And as the factfinder, the juvenile court's role was to evaluate the witnesses, judge their credibility, determine

21

who to believe or disbelieve, and weigh the evidence and any inconsistencies. *See Moon*, 410 S.W.3d at 375.

It is also significant, as the State points out, that the trial court was not required to make a finding regarding the likelihood of T.S.'s rehabilitation in order to transfer his case to an adult criminal court. *See C.A.P.*, 582 S.W.3d at 508. Indeed, the trial court's findings on the three other factors outlined in Section 54.02(f), which T.S. does not contest the sufficiency of, are sufficient to support the trial court's waiver of its jurisdiction and the discretionary transfer of this case. *See id.*

Giving credit to the evidence favorable to T.S.'s challenged finding and disregarding any contrary evidence, we conclude that there is more than a scintilla of evidence to support the trial court's finding that T.S. would not benefit from the services of the juvenile system. *See J.W.W.*, 507 S.W.3d at 413. Further, considering all the evidence, we hold that the juvenile court's finding is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* Because these evidentiary standards were met, we hold that the trial court did not abuse its discretion by waiving its jurisdiction and ordering T.S. transferred to the criminal district court. *See T.S.*, 548 S.W.3d at 730. We overrule T.S.'s sole issue.

## IV. CONCLUSION

Having overruled T.S.'s sole issue on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  February 25, 2021