Laura Carter Higley, Justice
T.S., a minor, has been charged with two counts of aggravated robbery in Brazoria, County. He brings this accelerated appeal to challenge the juvenile court's order, waiving its exclusive jurisdiction and transferring him to district court for criminal proceedings. In his sole issue, T.S. contends that the juvenile court abused its discretion by waiving its jurisdiction and transferring him to criminal court. Because we conclude that the juvenile court did not abuse its discretion, we affirm the order.
Background
On July 31, 2017, the State filed a Petition for Discretionary Transfer to Criminal Court. The State alleged that, "because of the seriousness of the offenses(s) and the background of [T.S.], the welfare of the community requires that the Juvenile Court waive jurisdiction" and transfer T.S. to criminal district court for the prosecution of two counts of aggravated robbery. The charges concerned an armed robbery of a Pearland pawn shop on June 26, 2017. Because two complainants were involved, two counts of aggravated robbery were alleged.
The State averred that T.S., who was born July 5, 2000, "is reasonably sophisticated and mature for his age and should be treated as an adult." The State asserted that "the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of [T.S.] by the use of procedures, services, and facilities currently available to the Juvenile Court is in serious doubt." The State also requested a hearing on the petition.
The juvenile court conducted an evidentiary hearing on the transfer petition on September 26, 2017. Detective C. Arnold of the Pearland Police Department testified about his investigation of the aggravated robbery. Detective Arnold was on duty on June 26, 2017 when the robbery at the pawn shop occurred. He responded to the scene and was placed in charge of the investigation.
When he arrived, Detective Arnold spoke to the three pawn shop employees who were working at the time of the robbery. He also viewed a store surveillance video that had captured the event. On the video, Detective Arnold saw a white truck back up to the pawn shop, five masked males jump out and run into the store.
One of the individuals brandished a handgun, which he pointed at two store employees. This individual was later determined to be Jacoby West. While West held the employees at gunpoint, the other four robbers jumped the counter and began loading rifles into duffle bags. Unbeknownst to the assailants, a third employee in the back of the store alerted authorities to the robbery. The employee also activated a metal door to close over the gun case.
*715 The five assailants then fled the store and left in the white truck to a nearby church parking lot. When the police arrived, the assailants split up. West was able to evade police on foot, but the other four individuals were detained.
T.S. was one of the four individuals apprehended. Detective Arnold testified that T.S. was 16 years old at the time of the robbery, and the other three individuals apprehended that night were 17 years old. Detective Arnold confirmed that the robbery occurred nine days before T.S.'s seventeenth birthday.
Two of the three 17-year-olds, J.J. and D.G., spoke to police. They each provided information about the robbery. J.J. and D.G. each identified T.S. as being involved in the robbery.
A tip soon led to the arrest of West, who, at the time of the robbery, was 26 years old, making him the only adult in the group. After his arrest, West was identified as a perpetrator in another robbery in Houston. West was taken to the Houston Police Department where Detective Arnold spoke to him about the Pearland pawn shop robbery. West admitted to Detective Arnold that he and D.G. had stolen the white truck used in the robbery in a recent carjacking. West also admitted that he provided the gun used in the robbery and that he had been the gunman.
When asked what West had said about his "co-actors" in the robbery, Detective Arnold testified that West "laid out all of their involvement and prior planning that went into the robbery." Detective Arnold said that West had identified T.S. as being involved in the planning of the robbery. West told Detective Arnold that he and two of the 17-year-olds, D.G. and J.J., had conducted "dry runs" to the pawn shop to learn how many guns the store had and where the security camera were located.
On cross-examination, Detective Arnold acknowledged that T.S. had not directly threatened anyone during the robbery. He agreed that the violent actor had been West, who wielded the gun. Detective Arnold acknowledged that the "totality of the evidence" gathered in his investigation suggested that West was "the guy that planned [the robbery] and recruited children to do it with him." However, Detective Arnold also testified that T.S. had indirectly threatened people in the pawn shop. Detective Arnold stated, "The mere act of jumping over the counter, grabbing firearms and rushing out of the store, that whole act put those individuals in fear inside the store."
Detective Arnold testified that the video did not show West controlling the four minors during the robbery. He pointed out that West's focus was on the store employees, and his back was to the four minors as they jumped the counter and grabbed the rifles. He stated that the four minors appeared to be "focused and driven" on their task of grabbing the guns. He testified that T.S. did not appear to be "operating under any duress or any threats or any coercion." Detective Arnold stated that, to the contrary, he learned information during the investigation indicating that T.S. was not operating under duress during the robbery. Specifically, Detective Arnold was told by T.S.'s "four co-defendants," Houston police, and an Alcohol, Tobacco, and Firearm (ATF) agent that T.S. was involved "in a similar aggravated robbery that occurred in Houston."
Dr. Fuller, the psychiatrist the court ordered to evaluate T.S. for the transfer hearing, also testified. Dr. Fuller had prepared a written report of his evaluation, which was admitted into evidence.
Dr. Fuller stated that, at the time of their meeting, T.S. was 17 years old and in the tenth grade at Can Academy, which *716 Dr. Fuller described as "an alternative school" "for youths who have had some difficulties in their regular high school." T.S. told Dr. Fuller that he had previously attended Sterling High School but had been expelled.
Dr. Fuller agreed that, at 17 years old, T.S. should be in a higher grade than tenth grade. However, "the fact that [T.S.] was behind a grade in school" was not a concern to Dr. Fuller. When asked whether being a grade behind might "suggest a mental deficiency that may impact [T.S.'s] trial knowledge, his understanding of the legal process, and his ability to participate in his defense," Dr. Fuller testified it could, or "[i]t could suggest behavioral problems" or a combination of the two. Dr. Fuller noted that T.S. told him he was receiving "decent grades," B's and C's, in school.
T.S. told Dr. Fuller that he "had been evaluated for and treated for Attention Deficit Hyperactivity Disorder when [he was] younger" but was uncertain whether he had ever taken medication for ADHD. T.S. did not indicate that he had any other psychiatric diagnosis. T.S. also reported to Dr. Fuller "that he smoked marijuana when he was 14 about twice a month: but had been "using it less frequently in the recent past."
Dr. Fuller also testified that, as part of his evaluation of T.S., he conducted a mental status examination, which evaluates concentration, memory, ability to focus, and ability to problem solve. Dr. Fuller noted that T.S. was alert and cooperative with the examination. He evaluated T.S.'s thought processes and determined that there was "no significant psychiatric symptoms." He noted that T.S.'s cognitive functioning, particularly his abstract reasoning were "functioning reasonably and appropriately." Dr. Fuller evaluated T.S.'s judgment and testified that he had no concerns.
Dr. Fuller stated that he assessed T.S.'s "trial knowledge" by administering a set of "semi-standardized set of questions that address fitness to proceed or competence to stand trial." He determined that T.S. had a rational understanding of the charges that were filed against him, and he understood "the adversarial nature of the legal process." Dr. Fuller stated that T.S. appeared "to understand those components of trial." T.S. indicated that he would "look to his attorney" "to engage in a reasoned choice of legal strategies and options." Dr. Fuller testified that he had no concerns about T.S.'s competency, trial knowledge or fitness to proceed. Dr. Fuller stated his final conclusion as follows:
It is my impression that, with the exception of the past history of Attention Deficit Hyperactivity Disorder, [T.S.] has no major psychiatric or psychological diagnoses. It is my impression that he meets criteria where the issue waiver-or competence to stand trial or fitness to proceed, that he meets criteria for that. It's my impression that he's reasonably intelligent for a 17-year-old and reasonably mature; and that, ultimately, there was no finding that I was privy to or information I was privy to that would be a barrier to waiving him to adult court.
On cross-examination, Dr. Fuller acknowledged that T.S. had been "polite and compliant" during the evaluation. He agreed that T.S. could benefit from the services that the juvenile justice system offers and also agreed that T.S. would be a good candidate for rehabilitative mental health services "were he so motivated for counseling." Dr. Fuller acknowledged that he did not observe "anything in [his] interaction [with T.S.] that would indicate a lack of motivation for counseling." However, when asked whether he thought "it's *717 more probable or less probable that [T.S.] would continue to engage in these [criminal] behaviors if he received psychiatric help in [the juvenile justice system]," Dr. Fuller responded, "I do not know. I do not know. I do not know him well enough."
As part of questioning focusing on the age difference between T.S. and West, Dr. Fuller agreed that "adults can often manipulate children into behavior because they're children and they don't appreciate the consequence." Dr. Fuller also stated he was aware that T.S. was the youngest of the actors. He acknowledged that 16-year-olds are subjected to peer pressure. However, when asked whether T.S. would not have participated in the robbery "absent that peer pressure and that manipulation by the adult, [West]," Dr. Fuller responded, "[T]hat's a leap beyond what I'm willing or able to speculate." Dr. Fuller's written "Report of Psychiatric Examination" was also admitted into evidence.
The State also called Patrick Okafor, the probation officer with the Brazoria County Juvenile Justice Department assigned to T.S. Okafor testified that he prepared a predisposition report in which he recommended that T.S. be certified to be tried as an adult.[1] In preparing the report, Okafor conducted a "full investigation" into T.S.'s background, including information about T.S.'s family, education, and contacts with "juvenile agencies."
In conducting his investigation for the report, Okafor testified that he initially learned that T.S. lived with his grandmother. Okafor understood from T.S.'s father that T.S. lived with his grandmother because he was not following the rules at home, and he was "butting heads" with his dad.
Okafor testified that he learned from T.S.'s mother that T.S. had "some ADHD in the past, but [she] said he was no longer currently on medications." Okafor also learned that T.S. admitted to marijuana use.
Okafor stated that he also contacted juvenile-probation authorities in Harris County. He learned that T.S. had been placed on one years' probation for a robbery at Sterling High School. Okafor testified that he was told that T.S. and D.G., who was also involved in the Pearland robbery, beat up another student at the high school and took his cell phone. Okafor stated that it was "robbery without a weapon involved" but the offense did involve "assault." Okafor indicated that he believed that T.S. had completed that probation.
Okafor testified that, as part of his investigation, he had spoken with an ATF agent who informed him that T.S. "and the other co-defendants from the Pearland pawn store alleged aggravated robbery were allegedly involved in five more other aggravated robberies throughout Harris County." The ATF agent told Okafor that the investigations into those robberies "were pending and that they had gotten a little delayed due to the recent flooding with [Hurricane] Harvey." Okafor testified that the ATF agent "advised that [T.S.] was being investigated for five other aggravated robberies throughout the Harris County area and that Harris County is planning on proceeding."
Okafor stated that his department recommended that T.S. be certified to stand *718 trial as an adult. When asked the basis for this recommendation, Okafor testified, "Because of the severity of the offense, his age, and his prior history with the Juvenile Justice Department." When asked what factors he considered when he mentioned "severity of the offense," Okafor answered, "[T]hat a gun was involved, gun-a weapon was involved, and then taking the property from a person." The State asked Okafor what "placement options" are available in the juvenile justice system for "someone like [T.S.] who's 17 and facing a serious offense." Okafor responded that there are "not many" options for T.S. because he is 17 years old. He stated that the placement options "usually last for a year," and "then after a year, there's usually ... intensive supervision afterwards once they're released."
When asked specifically about the options in the Texas Juvenile Justice Department, Okafor stated that his answer was the same. He said that there were "not many" placement options for T.S. in the TJJD due to his age, the severity of the offense, and his history of a previous robbery offense.
On cross-examination, Okafor acknowledged that T.S. would be subject to the jurisdiction of the TJJD for almost another two years until he was 19. However, he reiterated that two years was not be enough time for the TJJD to administer services to T.S. because of the severity of the aggravated-robbery offense. Okafor explained that he had experience with juveniles who had committed lesser crimes than T.S. and had required more than two years for the completion of services.
The State asked, "What do you believe about the prospect for [T.S.] as for rehabilitation in the juvenile justice system?" Okafor responded, "I don't believe that he'll have rehabilitation in juvenile ... because of his age and the prior history of the offense that's similar to the one he just committed." Okafor pointed out that, in his experience as a probation officer, T.S. would have received rehabilitative services as part of his probation in Harris County. He intimated that, despite receiving these services, T.S. re-offended.
The defense called two witnesses to testify at the transfer hearing: T.S.'s mother and his father. T.S.'s mother testified that T.S. is a "follower" not a leader. She stated that T.S. is not mature, explaining, "He just made bad decisions and I constantly have to tell him over and over again to do certain things that I feel like he should know but he doesn't."
T.S.'s mother testified that T.S. was 15 years old when he committed the robbery offense in Harris County at Sterling High School. She stated that T.S. had never been involved in a fight at school before committing that offense. T.S.'s mother stated that she had obtained the phone taken in the Harris County robbery from D.G., and she had then returned the phone to its owner. She confirmed that T.S. was placed on probation for one year in Harris County for the robbery. She also confirmed that T.S. had received and completed rehabilitative services in the juvenile system as part of his probation. She believed that the rehabilitative services helped T.S.
T.S.'s mother stated that T.S. had not been expelled from Sterling High School following the robbery. She said that he had voluntarily transferred to Can Academy "so he can get caught up on his credits." T.S.'s mother stated that T.S. had been held back one grade because he had failed two classes. He failed because he had difficulty focusing. She indicated that T.S. had taken medication for his ADHD until the eighth grade but had stopped taking it because it made him "zoned out" "like a *719 zombie." She testified that T.S. was doing well in school at Can Academy.
On cross-examination, T.S.'s mother acknowledged that T.S. had reoffended despite completing rehabilitative services as part of his probation in Harris County. She also testified that T.S. had been staying with his grandmother because he had not been following his father's rules.
T.S.'s father also testified. He testified that T.S. is a "passive" person, who "folds under peer pressure." T.S.'s father indicated that he knew that T.S.'s friends were a bad influence on him but was unable to keep them apart. He also testified that he blamed himself for what happened with T.S. He stated that T.S. had been disrespectful to him and his wife. He had "turned [his] back" on T.S. as a form of tough love to prove a point. He believed that it would cause T.S. "to come back home." Instead, he said that it had "backfired on me." T.S.'s father stated that he "never expect[ed] [T.S.] to do the stuff he was doing."
At the end of the hearing, the juvenile court ruled T.S. should be certified to stand trial as an adult for two counts of aggravated robbery and transferred to criminal district court. The juvenile court orally stated the basis for its ruling as follows:
[Defense counsel] is right. The nine days [that T.S. was shy of his seventeenth birthday at the time of the aggravated robbery] does make a big difference. It makes a difference both ways. It makes a difference that he's almost statutorily mature enough that we wouldn't even be having this hearing. Everything we heard in this hearing, had he been nine days older, would have been appropriate argument for mitigation, punishment, or whatever of that nature. I kind of wish that what I had was a stair-step system on adults where if they got in trouble at a certain age, I would keep jurisdiction two or three years or something of that nature to make sure that he's-I just don't have that. If I put him on probation-if I put him on probation next month, most I'm going to have him is about nine months. If I send him to [TJJD] I don't have the ability to monitor him. I just have to trust TJJD to do something appropriate. And it does seem to me in the adult world there are more options, everything from modifications, reductions, deferreds, things that could last a lot longer.
I'm going to make the following findings on the record. I actually find the offense was against both persons and property, since property was stole and persons because of the robbery-the forced nature, aggravated robbery, the conduct; and that it appears, based on probable cause, that [T.S.] was a party to that offense. I find he is sufficiently sophisticated and mature to be tried as an adult and to aid your attorney in your defense. I find that you had a prior record and that previous history is such that you ought to be certified to stand trial as an adult, meaning you were placed on probation for 12 months and it didn't seem to take. I know it shows as a robbery; but it sounds, though, from everybody, that it was two kids beating up another kid to steal the phone. That's robbery. The fact that Mama returned the phone doesn't mitigate that at all; and that gives me, in my mind, an inclination towards violent-type conduct, which the public isn't safe.
I don't think the public can be protected if he remained in the juvenile justice system because I just don't think we'll have him long enough in order to do so. And I think given his prior history and given the conduct, both then and now-and the other investigations don't really *720 enter my mind too much other than maybe social background. I mean, I didn't really take yay or nay as far as the other investigations are concerned. They will have to bear and stand on their own merit.
But many bad decisions on his part. Some concern with as he got in trouble, how things might have been handled. He's allowed to continue to associate with kids that-I think [C.H.] was his name that he has repeatedly been associated with. There's some at-home decisions that I have some problems with. But certainly probable cause to believe he committed the offense. As I said, I don't think the public can be protected if he remained in the juvenile justice system. And because of that, the system's ability to rehabilitate would be remote. I find that you were 16 at the time of the commission of the offense and they are first degree felonies and there has been no prior adjudication on the offense. Because of the seriousness of the alleged offense, the public cannot be protected if you remained in the juvenile justice system; and that because of your background, which includes the prior conduct, the public couldn't be protected if you remained in the juvenile justice system....
The juvenile court signed an order waiving juvenile jurisdiction and transferring T.S. to criminal district court for prosecution. In its order, the juvenile court made findings to support the waiver of its jurisdiction and its transfer of T.S. to criminal district court. See TEX. FAM. CODE ANN. § 54.02(h) (West 2014). This appeal followed. Id. § 56.01(c)(1)(A) (West Supp. 2017).
Juvenile Court's Waiver of Jurisdiction
In one issue, T.S. contends that the juvenile court abused its discretion by waiving its jurisdiction and transferring him to criminal court.
A. Juvenile Justice Code Section 54.02
In Moon v. State , the Court of Criminal Appeals stated:
The transfer of a juvenile offender from juvenile court to criminal court for prosecution as an adult should be regarded as the exception, not the rule; the operative principle is that, whenever feasible, children and adolescents below a certain age should be "protected and rehabilitated rather than subjected to the harshness of the criminal system[.]"
451 S.W.3d 28, 36 (Tex. Crim. App. 2014) (alteration in original) (quoting Hidalgo v. State , 983 S.W.2d 746, 754 (Tex. Crim. App. 1999) ).
The Moon court further explained, "The right of the juvenile offender to remain outside the jurisdiction of the criminal district court, however, is not absolute." Id. at 38. Section 54.02(a) of the Juvenile Justice Code provides that the juvenile court may waive its exclusive original jurisdiction and transfer a child to the criminal district court for criminal proceedings if the following is determined:
(1) the child is alleged to have violated a penal law of the grade of felony;
(2) the child was ... 14 years of age or older at the time [of the alleged] offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree[;] ... and
(3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.
*721 TEX. FAM. CODE ANN. § 54.02(a) (West 2014).
When determining the seriousness of the offense alleged or the background of the child as found in the third requirement, Section 52.04(f) requires the juvenile court to consider, "among other matters," the following factors:
(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
(2) the sophistication and maturity of the child;
(3) the record and previous history of the child; and
(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.
Id. § 54.02(f).
As the petitioner seeking waiver and transfer, the State has the burden "to produce evidence to inform the juvenile court's discretion as to whether waiving its otherwise-exclusive jurisdiction is appropriate in the particular case." Moon , 451 S.W.3d at 40. The State must "persuade the juvenile court, by a preponderance of the evidence, that the welfare of the community requires transfer of jurisdiction for criminal proceedings, either because of the seriousness of the offense or the background of the child (or both)." Id. at 40-41.
When exercising its discretion to transfer, the juvenile court must consider all four of the factors listed in Section 54.02(f). Id. at 41. Although it makes its final determination from the evidence concerning the Section 54.02(f) factors, the juvenile court "need not find that each and every one of those factors favors transfer before it may exercise its discretion to waive jurisdiction." Id.
The Moon court, however, made clear that, as required by Section 54.02(h), if the juvenile court waives jurisdiction, it must "state specifically" in its order its reasons for waiver. See ids="6890110" index="7" url="https://cite.case.law/sw3d/451/28/#p36">id. ; see also TEX. FAM. CODE ANN. § 54.02(h). The order must also show that the juvenile court considered the four factors found in Section 54.02(f), although the court "need make no particular findings of fact with respect to those factors." Id. at 41-42. With regard to the specificity requirement, the Moon court explained,
[T]he Legislature has required that, in order to justify the broad discretion invested in the juvenile court, that court should take pains to "show its work," as it were, by spreading its deliberative process on the record, thereby providing a sure-footed and definite basis from which an appellate court can determine that its decision was in fact appropriately guided by the statutory criteria, principled, and reasonable[.]
Id. at 49.
B. Standard of Review
In Moon , the Court of Criminal Appeals clarified the standard of review to be applied by an appellate court when a juvenile court waives its exclusive jurisdiction pursuant to Section 54.02. The court held: "[I]n evaluating a juvenile court's decision to waive its jurisdiction, an appellate court should first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under 'traditional sufficiency of the evidence review.' " Id. at 47.
Under a legal sufficiency challenge, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. Moon v. State , 410 S.W.3d 366, 371 (Tex. App.-Houston [1st Dist.] 2013), aff'd *722 Moon , 451 S.W.3d at 52. If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. Id. Under a factual sufficiency challenge, we consider all of the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. Id.
With regard to the sufficiency review, the Court of Criminal Appeals further held,
[I]n conducting a review of the sufficiency of the evidence to establish the facts relevant to the Section 54.02(f) factors and any other relevant historical facts, which are meant to inform the juvenile court's discretion whether the seriousness of the offense alleged or the background of the juvenile warrants transfer for the welfare of the community, the appellate court must limit its sufficiency review to the facts that the juvenile court expressly relied upon, as required to be explicitly set out in the juvenile transfer order under Section 54.02(h).
Moon , 451 S.W.3d at 50.
After conducting a "traditional sufficiency of the evidence review" of the juvenile court's specific findings, the appellate court "should then review the juvenile court's ultimate waiver decision under an abuse of discretion standard." Id. at 47. With regard to the abuse-of-discretion analysis, the court explained,
[I]n deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria?
Id. "So long as the juvenile court correctly applies these statutory criteria and complies with the requirement to specifically state its supporting findings, its waiver decision generally will pass muster under this standard of review." In re S.G.R. , 496 S.W.3d 235, 239 (Tex. App.-Houston [1st Dist.] 2016, no pet.) (citing Moon , 451 S.W.3d at 49 ).
C. Juvenile Court's Order
The juvenile court made the following determinations in its order to support its decision to transfer T.S. to criminal court for prosecution as an adult:
The Court finds [T.S.] to be a male child born on 5th day of July, 2000, and being 16 years of age at the time the offenses upon which the Petition is founded [are] alleged to have occurred....
At present time, said juvenile is 17 years of age.... Prior to the discretionary transfer hearing, this court ordered a complete diagnostic study of the child by Dr. Michael Fuller, and such diagnostic study was obtained.
....
Among others, this Court considered the following matters:
(1) whether the alleged offense(s) were against person or property;
(2) the sophistication and maturity of the child;
(3) the record and previous history of the child;
(4) the prospects of adequate protection of the public and the likelihood of rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.
*723 The Court finds the offenses of which the juvenile is alleged to have committed are felonies under the penal laws of the State of Texas.
The Court finds that the alleged offenses are against persons. The Court finds that there is probable cause to believe that the child [T.S.] committed the alleged offenses.
[T.S.] is alleged to be involved in two counts of felony aggravated robbery offenses involving firearms.
....
The Court finds that the child is of sufficient sophistication and maturity to be tried as an adult. In support, the Court finds that the Respondent attends High School. He denies ever being diagnosed with a learning disorder. He was previously diagnosed with Attention Deficit Hyperactivity Disorder and followed the doctor's recommendations at that time. The Respondent does not have issues of alcohol abuse, but had been a user of marijuana on a monthly basis with less current use. The psychiatric assessment demonstrated that the Respondent is of average intelligence with no symptoms of major psychiatric illness. He is logical, coherent and goal directed in thought processes and speech. The Respondent has adequate judgment ability to make sound decisions. He has significant and appropriate insight into the seriousness of the charges against him. In addition, the psychiatrist also evaluated the areas of trial knowledge related to the criminal justice system to assist in determining the maturity of the Respondent.
The Court finds that because of the records and previous history of the child, the child's age, and because of the extreme and severe nature of the alleged offenses, the prospects of adequate protection for the public and likelihood of reasonable rehabilitation of the child by the use of the procedures, services and facilities, which are currently available to the Juvenile Court, are in doubt.
The Court, after considering all of the testimony, diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offenses, finds that it is contrary to the best interests of the public to retain jurisdiction. The Court finds there is probable cause to believe that the child committed the alleged offenses and that because of the seriousness of the alleged offenses and the background of the child, the welfare of the community requires criminal proceedings.
The court, in support of said findings, further finds: Juvenile's prior criminal history, social report and psychological evaluation indicates rehabilitation in the juvenile system remote and the public cannot be protected from within the juvenile justice system....
The juvenile court also provided a narrative of the events involved in the Pearland robbery, describing the particulars of the offense.
Here, the juvenile court's order stands in contrast to the order in Moon. There, the Court of Criminal Appeals determined that the order waiving jurisdiction was deficient because it lacked sufficient specificity to support the transfer. Id. at 50-51. In Moon , the only reason stated for waiver-seriousness of the offense-was not supported by "case-specific findings of fact." Id. at 51. The Moon court observed that the juvenile court had found facts "that would have been relevant to support transfer for the alternative reason that the appellant's background was such as to render waiver of juvenile jurisdiction," however, "because the juvenile court did not cite *724 the appellant's background as a reason for his transfer in its written order, these findings of fact [were] superfluous." Id.
The transfer order here does not suffer from the same defects. The juvenile court's order expressly identifies both reasons found in Section 54.02(a)(3)-seriousness of the offenses and T.S.'s background-to support its conclusion that the welfare of the community required transfer for criminal proceedings. See TEX. FAM. CODE ANN. § 54.02(a)(3), (h) ; cf. Moon , 451 S.W.3d at 51. In support of this determination, the juvenile court stated specific fact findings relating to the factors listed in Section 54.02(f).
We first examine the sufficiency of the evidence to support the findings on which the juvenile court based its determination that the seriousness of the offenses and T.S.'s background required waiver to criminal court to protect the public's welfare.
D. Sufficiency-of-the-Evidence Analysis
1. Seriousness of the Offenses
In the transfer order, the juvenile court recognized the offenses as "two counts of felony aggravated robbery." Relevant to the juvenile court's seriousness determination, the juvenile court considered the first 54.02(f) factor, finding that "[t]he alleged offenses are against persons." See TEX. FAM. CODE ANN. § 54.02(f)(1). The juvenile court found that the aggravated-robbery offenses involved firearms and described them as being of an "extreme and severe" nature.
The juvenile court also made findings regarding the particular facts of the offenses. The court found that the robbery offenses were perpetrated by threatening store employees with a firearm and that the object of the robbery was to steal firearms. In describing the offenses, the juvenile court found that "[t]he gunman ... approached the two victims ... and instructed them to comply with the gunman's demands to remain in their positions at gunpoint." The juvenile court noted that, while the victims were held at gunpoint, the other four actors, including T.S., "proceeded to seize firearms, primarily rifles, from the display rack located behind the glass counters at the store." Detective Arnold's testimony at the transfer hearing supported these findings.
On appeal, T.S. does not dispute that he is "alleged to be a party to an offense committed against people," however, he points out that "there is no evidence that [he] personally took any aggressive action towards another person in the alleged offense." On cross-examination, Detective Arnold agreed that he did not observe T.S., on the store's surveillance video, engage in any violent or aggressive acts during the robbery. However, Detective Arnold testified that T.S. had indirectly threatened people in the pawn shop. He stated, "The mere act of jumping over the counter, grabbing firearms and rushing out of the store, that whole act put those individuals in fear inside the store."
T.S. also points out that, on cross-examination, Detective Arnold agreed that T.S. and the other three minors could be analogized to "pack mules" because their role was "to carry the spoils of the robbery." However, in contrast to the evidence T.S. cites to minimize his role in the robbery, Detective Arnold testified that he learned from West that T.S. participated in planning the robbery. Detective Arnold also testified that the video showed T.S. and the other three minors "focused and driven" on their task during the robbery, showing no signs of duress or coercion. Detective Arnold's testimony indicated that Appellant had been an active participant in the aggravated robbery.
*725 We conclude that the record contains more than a scintilla of evidence to support the juvenile court's findings that the offenses involved a firearm used to hold two people at gunpoint to facilitate the taking of other firearms. We also conclude that these findings were not against the great weight of the evidence. Thus, the evidence was legally and factually sufficient to support these findings, which were supportive of the juvenile court's determination that the seriousness of the offenses was a factor in its decision to waive jurisdiction to criminal court.
We are mindful that the Court of Criminal Appeals recognized in Moon :
[T]he offense that the juvenile is alleged to have committed, so long as it is substantiated by evidence at the transfer hearing and of a sufficiently egregious character, will justify the juvenile court's waiver of jurisdiction regardless of what the evidence may show with respect to the child's background and other Section 54.02(f) factors.
Moon , 451 S.W.3d at 48. However, here, we need not determine whether the seriousness of the offense alone would justify the juvenile court's waiver of jurisdiction because the court indicated in its transfer that the decision was also based on T.S.'s background.
2. T.S.'s Background
In support of its determination that T.S.'s background supported waiver, we review the juvenile court's consideration of the second through fourth Section 52.04(f) factors. See TEX. FAM. CODE ANN. § 54.02(f)(2),(3),(4).
a. Sophistication and maturity
The second 54.02(f) factor pertains to T.S.'s sophistication and maturity. In the order, the juvenile court made the following findings:
The Court finds that the child is of sufficient sophistication and maturity to be tried as an adult. In support, the Court finds that the Respondent attends High School. He denies ever being diagnosed with a learning disorder. He was previously diagnosed with Attention Deficit Hyperactivity Disorder and followed the doctor's recommendations at that time. The Respondent does not have issues of alcohol abuse, but had been a user of marijuana on a monthly basis with less current use. The psychiatric assessment demonstrated that the Respondent is of average intelligence with no symptoms of major psychiatric illness. He is logical, coherent and goal directed in thought processes and speech. The Respondent has adequate judgment ability to make sound decisions. He has significant and appropriate insight into the seriousness of the charges against him. In addition, the psychiatrist also evaluated the areas of trial knowledge related to the criminal justice system to assist in determining the maturity of the Respondent.
The case-specific findings, supporting the juvenile court's determination that T.S. was sufficiently sophisticated and mature to stand trial as an adult, are derived from and supported by the testimony and written psychiatric evaluation of Dr. Fuller. T.S. does not assert that the evidence is legally insufficient to support the juvenile court's finding that he is "of sufficient sophistication and maturity to be tried as an adult." Instead, he asserts that the evidence is factually insufficient to support the finding.
T.S. claims that "significant portions of Dr. Fuller's testimony contradicted the juvenile court's finding that T.S. was sufficiently sophisticated and mature to be tried as an adult." T.S. points out that Dr. Fuller "testified that during the mental *726 status examination T.S. had difficulty "subtracting 7 from 100 serially." T.S. was then given an alternative test of spelling "world" backwards, a task that T.S. successfully completed. T.S. claims that Dr. Fuller "testified that T.S.'s performance could conceivably suggest a mental deficiency that would result in poor school performance or slower maturation relative to his peers." However, the record shows that T.S. is not taking into account the entire context of Dr. Fuller's testimony:
Q. Okay. So, were there no abnormal or unusual elements?
A. No significant abnormal or unusual elements. He had a little bit of difficulty, for example, with subtracting 7 from 100 serially. And so, he was given an alternative to spell "world" backwards. And that's a rough equivalent to determine elements of concentration and focus and able to keep a task in hand, in mind.
Q. And those would suggest not some sort of abnormal or deviant mental condition, but you'll agree with me that those would suggest a mental deficiency that would lead to someone being held back a year and that would also lead to someone maturing at a slower pace than his peers?
A. Conceivably.
Q. Okay. And if [T.S.] matured at a slower pace than his peers, wouldn't that suggest that he didn't have a rational-as rational of an understanding of the consequence of his actions of just other 16-year-olds?
A. It might suggest that.
Q. Well, did it suggest it to you?
A. No.
Q. Why not?
A. He appeared to me to be a reasonable and rational 16, slash, 17-year-old. Or just turned 17-year-old.
Although he agreed that an inability to serially subtract 7 from 100 could "conceivably" suggest a "mental deficiency" and slow maturation, Dr. Fuller did not agree that T.S. failed to have a rational understanding of the consequence of his actions compared with other 16-year-olds. To the contrary, Dr. Fuller testified that T.S. appeared reasonable and rational for his age.
On appeal, T.S. asserts, "Dr. Fuller agreed that any involvement by T.S. in the alleged offense might have been on account of peer pressure and manipulation by the older actors." He further avers as follows in his brief:
Fuller testified that there is a significant developmental difference between the average sixteen-year-old and the average twenty-six-year-old male (West's age at the time of the offense). Fuller testified that adults might manipulate children since children do not fully appreciate the consequences of their actions. Fuller testified that there was a possibility that T.S. had been manipulated into participating in the robbery. If the older men had manipulated T.S. into participating in the robbery, it would suggest that T.S. lacked an appreciation for the consequences of his actions.
(Record references omitted.) T.S. also pointed out that Detective Arnold commented that T.S. may have allowed himself to be controlled.
T.S. is correct that Dr. Fuller agreed that there is big difference between the maturity levels of a 26-year-old and a 16-year-old. He also agreed that adults can manipulate children into wrongful behavior because children do not appreciate the consequences of their conduct. He acknowledged that, under such circumstances, a child's behavior may "normalize" after the adult's influence is removed. Dr. Fuller agreed there was a "possibility" that T.S. was manipulated into committing *727 the offense. However, Dr. Fuller did not testify that T.S. had been manipulated or pressured into committing the offense. He merely acknowledged the possibility. And, when asked to testify that T.S. would not have committed the offense absent the age differences and "absent [the] peer pressure and [the] manipulation by the adult," Dr. Fuller stated, "[T]hat's that's a leap beyond what I'm willing or able to speculate."
T.S. also cites a statement by Detective Arnold that T.S. allowed himself to be controlled. However, to understand it, the cited testimony must be viewed in the context in which it was made:
Q. Okay. So, from the totality of the evidence that you have reviewed, including the other officer's questioning of [T.S.], the testimony you've heard from Dr. Fuller while sitting here, the review of the video, is there anything to suggest to you that [T.S.] has a predisposition towards violence?
A. Other than allowing himself to become involved into this type of an aggravated robbery, allowing himself to be controlled.
Q. Okay. And it's important-you said allowing himself to be controlled. 26-year-olds and 30-year-olds who hang out at juvenile parks [like West] are the type of people that control kids. Right?
A. They can.
....
Q. Does the evidence suggest that [West] was controlling these four young men?
A. No, sir. On the video, it-again, [West's] back is to the four men [including T.S.]. I can't see what goes on prior to them entering the store. On the video it appears that [West] is focusing with [sic] the individuals [employed] at the store, and the four individuals that grab the guns are jumping on the counter grabbing the guns.
Detective Arnold also testified that there was "no appearance" on the video that T.S. was acting under duress or coercion during the robbery. Detective Arnold indicated that T.S. appeared to be "driven and focused" on his task of grabbing the guns during the robbery. He did not observe any indication in the surveillance video that T.S. was acting under West's direction or control.
T.S. also points out that Detective Arnold testified that West "appeared to be" the primary planner of the robbery. West had been the gunman during the robbery. Detective Arnold testified that West supplied the gun, which had been stolen in a Houston burglary, and he supplied the white truck driven to and from the robbery. West admitted to Detective Arnold that he and D.G., also involved in the Pearland robbery, had stolen the truck in an armed Houston carjacking. West also supplied the masks and gloves worn during the robbery.
Detective Arnold acknowledged that T.S. had not engaged in any direct acts of violence during the robbery. He agreed that T.S.'s role of grabbing and carrying the stolen guns could be analogized to him acting as a "pack mule." Detective Arnold testified that West told him that he and the three 17-year-olds had planned the robbery by conducting "dry runs" to the pawn shop to determine how many guns were there and to locate any surveillance cameras.
However, Detective Arnold testified that West had indicated that T.S. played a role in the planning of the robbery. And Detective Arnold testified that T.S. had indirectly acted in a threatening manner toward *728 the people in the pawn shop. He averred that T.S.'s "act of jumping over the counter, grabbing firearms and rushing out of the store, that whole act put those individuals in fear inside the store."
Lastly, T.S. cites the testimony of his parents as undermining the juvenile court's finding that he is of sufficient sophistication and maturity to be tried as an adult. He points to his mother's testimony that he is a "follower." And he points out that his "father said that he was a passive person who easily folded under peer pressure." But T.S. fails to recognize that the juvenile court, like any other fact finder, was free to believe or disbelieve his parents' testimony. See In re D.W.L. , 828 S.W.2d 520, 525 (Tex. App.-Houston [14th Dist.] 1992, no pet.) (recognizing that juvenile court is sole fact-finder in pretrial hearing and may choose to believe or disbelieve any or all of witnesses' testimony).
We conclude that the record contains more than a scintilla of evidence to support the juvenile court's findings that T.S. was sufficiently sophisticated and mature to be tried as an adult. We also conclude that the finding was not against the great weight of the evidence. Thus, the evidence was legally and factually sufficient to support the finding.
b. Record and referral history considered with rehabilitation and protection of the public
The third 54.02(f) factor pertains to T.S.'s record and previous history. See TEX. FAM. CODE ANN. § 54.02(f)(3). The fourth factor pertains to the prospects of adequate protection of the public and the likelihood of the rehabilitation of T.S. by use of procedures, services, and facilities currently available to the juvenile court. Id. § 54.02(f)(4). Relevant to these factors, the juvenile court's order provides,
The Court finds that because of the records and previous history of the child, the child's age, and because of the extreme and severe nature of the alleged offenses, the prospects of adequate protection for the public and likelihood of reasonable rehabilitation of the child by the use of the procedures, services and facilities, which are currently available to the Juvenile Court, are in doubt.
....
The court, in support of said findings, further finds: Juvenile's prior criminal history, social report and psychological evaluation indicates rehabilitation in the juvenile system remote and the public cannot be protected from within the juvenile justice system.
Addressing the third factor, T.S. complains that the order does not identify any case-specific facts "for its finding regarding T.S.'s record and previous history." He avers, "Instead, the juvenile court order merely stated that the T.S. had a record and previous history." However, T.S.'s argument misses the mark. The juvenile court did not cite T.S.'s record and history directly as an independent reason to waive jurisdiction. Instead, the court cited his record and history as reasons to support its finding-under the fourth 54.02(f) factor-that, if T.S. remains in the juvenile justice system, the likelihood that he can be rehabilitated, and the public protected, are doubtful and remote. And, contrary to T.S.'s assertion, the juvenile court's finding was case-specific in that it cited T.S.'s "criminal" history.
A juvenile court "need make no particular findings of fact" with respect to the 54.02(f) factors. Moon , 451 S.W.3d at 42. "[T]he juvenile court is not required to exhaustively catalogue all evidence introduced during the transfer hearing in its written order; the statute merely requires it to specify its reasons and findings for *729 waiver." In re S.G.R. , 496 S.W.3d at 241. And "reviewing courts should bear in mind that not every Section 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction." Moon , 451 S.W.3d at 47. Here, the juvenile court (1) made independent and affirmative findings for factors one, two, and four, (2) considered and incorporated the third factor into its fourth-factor finding, and (3) cited case-specific facts in support of waiver. The juvenile court's decision not to make a separate finding indicating that T.S.'s record and previous history independently support waiver is not fatal to the transfer order. See ids="6890110" index="30" url="https://cite.case.law/sw3d/451/28/#p36">id.
We turn to T.S.'s challenge to the juvenile court's fourth-factor findings that, if he remains in the juvenile justice system, the likelihood that he can be rehabilitated, and the public protected, are doubtful and remote. The order indicates that the findings were based on (1) T.S.'s "records and previous history," (2) his age, (3) "the extreme and severe nature of the alleged offenses," (4) T.S.'s "criminal history," (5) and probation officer Okafor's social report and Dr. Fuller's psychological evaluation.
On appeal, T.S. claims "there was no evidence T.S. could not be rehabilitated within the juvenile system, and there was no evidence that the protection of the public could not be achieved within the juvenile system." We disagree.
Okafor recommended that T.S. be certified to stand trial as an adult "[b]ecause of the severity of the offense, his age, and his prior history with the Juvenile Justice Department." When asked what factors he considered when he mentioned "severity of the offense," Okafor answered, "[T]hat a gun was involved, gun-a weapon was involved, and then taking the property from a person." When the State asked Okafor what "placement options" are available in the juvenile justice system for "someone like [T.S.] who's 17 and facing a serious offense," Okafor responded that there are "not many" options for T.S. because he is 17 years old and would age out of the system at 18. He explained that the placement options "usually last for a year," and "then after a year, there's usually ... intensive supervision afterwards once they're released."
When asked specifically about the options in the Texas Juvenile Justice Department, Okafor stated that his answer was the same. He said that there were "not many" placement options for T.S. in the TJJD due to his age, the severity of the offense, and his history of a previous robbery offense.
On cross-examination, Okafor acknowledged that T.S. would be subject to the jurisdiction of the TJJD for almost another two years until he was 19. However, he reiterated that two years was not be enough time for the TJJD to administer services to T.S. because of the severity of the aggravated-robbery offenses. Okafor explained that he had experience with juveniles who had committed lesser crimes than T.S., and they had required more than two years for the completion of services.
The State asked, "What do you believe about the prospect for [T.S.] as for rehabilitation in the juvenile justice system?" Okafor responded, "I don't believe that he'll have rehabilitation in juvenile ... because of his age and the prior history of the offense that's similar to the one he just committed." The evidence showed that T.S., at age 15, had committed a robbery at Sterling High School. T.S. and D.H. had assaulted another student at the high school and taken his cell phone. T.S. was *730 ordered to serve one-year probation in the juvenile system for the offense.
Okafor pointed out that, in his experience as a probation officer, T.S. would have received rehabilitative services as part of his probation in Harris County. T.S.'s mother confirmed that T.S. had received and completed rehabilitative services as part of his probation for the robbery offense.
Okafor intimated that, despite receiving rehabilitative services through the juvenile system, T.S. had nonetheless re-offended. In addition to the Pearland aggravated robbery, Okafor testified that he had learned that T.S. "and the other co-defendants from the Pearland pawn store alleged aggravated robbery were allegedly involved in five more other aggravated robberies throughout Harris County." An ATF agent told Okafor that the investigations into those robberies "were pending and that they had gotten a little delayed due to the recent flooding with [Hurricane] Harvey." Okafor testified that the ATF agent "advised that [T.S.] was being investigated for five other aggravated robberies throughout the Harris County area and that Harris County is planning on proceeding." Detective Arnold also testified that he was told by T.S.'s "four co-defendants," Houston police, and an ATF agent that T.S. was involved "in a similar aggravated robbery that occurred in Houston."
In his brief, T.S. points to portions of Okafor's testimony he claims undermine the juvenile court's findings. He points out that Okafor did not testify there were no rehabilitation options for T.S. in the juvenile system; rather, he testified that there were "not many" options. T.S. also points out that Okafor seemed confused regarding whether T.S. would be subject to the juvenile justice system until he was 18 or 19 years old. However, Okafor clarified that, even if T.S. stayed in the juvenile system until he was 19, there was not sufficient time to rehabilitate him given his current age, the severity of the charged offenses, and his past history of a similar offense. In any event, as the factfinder, the juvenile court was permitted to resolve any inconsistencies in the evidence. See Collins v. State , 516 S.W.3d 504, 524 (Tex. App.-Beaumont 2017, pet. denied) ; see also In re N.P. , No. 03-17-00561-CV, 2017 WL 5078145, at *3 (Tex. App.-Austin Oct. 31, 2017, no pet.) (mem. op.) (recognizing, in juvenile transfer case, that, "to the extent that some details of [witness's] testimony would not tend to support the [juvenile] court's finding, we note that it was the court's role as fact-finder to weigh all the evidence and resolve apparent inconsistencies").
T.S. also asserts that "[t]he evidence established that T.S. was not a continuing danger to society and was amenable to rehabilitation." On cross-examination, Dr. Fuller agreed that his written report mentioned that T.S. had expressed "remorse and regret" regarding the aggravated robbery. Dr. Fuller also agreed that his report noted that T.S. was compliant during the psychiatric evaluation and had participated "in all levels of the inquiry." When asked whether "that suggest[ed] that the prospect for rehabilitation would be great as opposed to remote" for T.S., Dr. Fuller responded that it "would suggest that it would be relatively better with him than with many others." The defense then asked, "[If] the State is required to establish that the prospect for rehabilitation is remote, in fact, you'll agree with me that the-not the finding, but the substance of the report contradicts that allegation?" Dr. Fuller responded, "It gives rise to question for sure."
However, Dr. Fuller also testified that he was only "very superficially" familiar with the rehabilitative services available *731 through the juvenile justice system. And, when asked whether he thought "it's more probable or less probable that [T.S.] would continue to engage in these [criminal] behaviors if he received psychiatric help in TYC," Dr. Fuller responded, "I do not know. I do not know. I do not know him well enough."
T.S. also cites testimony by Dr. Fuller that he had not observed anything to indicate that T.S. was a continuing danger to the public. However, Dr. Fuller stated that he had no opinion whether T.S. should be tried as an adult to ensure the safety and protection of the community. Although his testimony ran counter, in some respects, to the juvenile court's finding that public safety and the prospects for T.S.'s rehabilitation weighed in favor of transfer, Dr. Fuller's overall testimony was not incompatible with the court's findings.
The juvenile court found that transfer was warranted because the juvenile justice system could not adequately protect the public from T.S. or rehabilitate him. We conclude that the record contains more than a scintilla of evidence to support the juvenile court's findings, and the great weight and preponderance of the evidence is not to the contrary. Therefore, the evidence was legally and factually sufficient to support the fourth-factor findings.
E. Discretion to Waive Jurisdiction
The Court of Criminal Appeals has advised that "the juvenile court that shows its work should rarely be reversed." Moon , 451 S.W.3d at 49. "This is because the juvenile court's discretion is 'at its apex when it makes this largely normative judgment' regarding whether a child eligible to be tried as an adult should be transferred to the criminal court." In re S.G.R. , 496 S.W.3d at 243 (citing Moon , 451 S.W.3d at 46 ).
This case is not the rare one in which reversal is warranted in spite of the juvenile court's adherence to the statutory criteria. The juvenile court considered each of the factors listed in Section 54.02(f). It "showed its work" by providing specific reasons and findings in support of its decision to waive its jurisdiction and transfer T.S. to criminal court. We have concluded that the juvenile court's findings are supported by legally and factually sufficient evidence. Given the juvenile court's statutory compliance and the evidence supporting the juvenile court's findings, we conclude that the juvenile court's decision to transfer T.S. to criminal district court for prosecution as an adult was not arbitrary, but instead represented a reasonably principled application of the legislative criteria found in Section 54.02. Thus, we hold that the juvenile court did not abuse its discretion in waiving its exclusive jurisdiction and transferring T.S. to criminal district court.
We overrule T.S.'s sole issue.
Conclusion
We affirm the juvenile court's order waiving juvenile jurisdiction and transferring T.S. to criminal district court.

The State asked, "What is a predisposition report?" Okafor responded, "A social history report. It gives background, some information about the juvenile, his family, his school, sometimes a goal of what he wants to do in life, some-they speak to some counselors, some mental health stuff in there, relationship with parents." The predisposition report was admitted into evidence.