**Opinion issued January 16, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NOS. 01-24-00568-CV & 01-24-00569-CV

_____

### IN THE MATTER OF D.T.

---

### On Appeal from the 314th District Court
### Harris County, Texas
### Trial Court Case Nos. 2023-01530J & 2023-01416J

---

### MEMORANDUM OPINION

In these two accelerated appeals, D.T. challenges the juvenile court's orders, rendered after a transfer hearing, waiving the juvenile court's exclusive original jurisdiction over D.T.'s cases and transferring him to criminal district court to be tried as an adult for the felony offenses of murder and aggravated robbery.[1] *See* TEX.

---

[1] Appellate cause number 01-24-00568-CV corresponds with juvenile court cause number 2023-01530J (murder offense). Appellate cause number 01-24-00569-CV

PENAL CODE §§ 19.02 (murder), 29.03 (aggravated robbery). In two appellate issues, D.T. challenges the orders, asserting that the evidence was legally and factually insufficient to support the findings required by Family Code section 54.02 to waive the court's jurisdiction and transfer D.T. to criminal court for prosecution.

Because the evidence was legally and factually sufficient to support the findings, we affirm the juvenile court's orders.

## Background

The State filed two separate cases against D.T. in juvenile court. In each case, the State alleged in its original petition, and later in its amended petition, that D.T.— who was born in November 2007—was over the age of ten and under the age of seventeen when he engaged in delinquent conduct. In the first-filed case, the State asserted that D.T. had engaged in delinquent conduct by committing the offense of aggravated robbery. The State alleged that, on May 23, 2023, D.T. "unlawfully, while in the course of committing theft of property owned by ANGEL ALVAREZ and with intent to obtain and maintain control of the property, intentionally and knowingly threaten[ed] and place[d] ANGEL ALVAREZ in fear of imminent bodily injury and death." The State also alleged that D.T. had "use[d] and exhibit[ed] a deadly weapon," a firearm.

corresponds with juvenile court cause number 2023-01416J (aggravated robbery offense).

In the second-filed case, the State asserted that, on April 13, 2023, D.T. engaged in delinquent conduct by committing the offense of murder. The State alleged that D.T. "unlawfully, intentionally and knowingly cause[d] the death of JUAN CHITY, by shooting him with a deadly weapon, namely, a firearm." In each amended petition, the State asked the juvenile court to waive its exclusive original jurisdiction and to transfer D.T. to criminal district court for criminal proceedings. The State also filed a motion in each case seeking waiver and transfer.

On June 13, 2024, the juvenile court conducted a hearing on the waiver and transfer motions. At the hearing, Detective L. Castellanos of the Houston Police Department testified about the investigations leading to the aggravated robbery and murder charges.

Detective Castellanos was dispatched to the scene of a shooting on Martindale Road around 8:00 p.m. on April 13, 2023. Patrol officers had already been dispatched to the scene. When they arrived, the officers found a man at the scene— whom Detective Castellanos referred to as "Byron"—providing CPR to a shooting victim, Juan Chiti. By the time Detective Castellanos arrived at the scene, Chiti had already been taken to the hospital for surgery. Chiti died at the hospital two days later from a gunshot wound to his head.

Detective Castellanos interviewed Byron and learned that the shooting had occurred at a different location—an apartment complex on Selinsky Road. Detective

3

Castellanos obtained surveillance video from the apartment complex showing the events surrounding the shooting. The video was admitted into evidence at the transfer hearing, and Detective Castellanos provided testimony about the events shown in the video.

The video showed the parking lot and the entrance gate for the apartment complex. A Toyota Corolla, shown in the far-right corner of the video frame, was parked in a spot not far from the complex's entrance. The Corolla was backed into the parking spot with its driver's side door facing the surveillance camera. Detective Castellanos later learned from Byron that Chiti was sitting in the Corolla's driver's seat, and Byron was in the backseat.

In the video, a person, wearing a light-blue hoodie, walked through the parking lot toward the Corolla. The person went around to the passenger side of the vehicle. About eight seconds later, the Corolla drove off at a high rate of speed. As the Corolla drove away, the person in the light-blue hoodie ran from the scene, and other people in and near the parking lot scattered and ran away.

Detective Castellanos testified that, with regard to the shooting, Byron told him that he saw a "male in a blue hoodie appear on the front passenger side of the vehicle to try to get in and he heard a gunshot." Byron then saw Chiti "fall down." Chiti was still in the driver's seat but could not move. Byron climbed on top of Chiti and drove the Corolla from the scene to Martindale Road where he called 9-1-1.

4

Byron also told Detective Castellanos that he communicated with the assailant before the shooting through Telegram, a messaging app. Byron knew the assailant by the name "Dae Dae." He indicated that the purpose of the meeting was for the sale of marijuana.

From the surveillance video, Detective Castellanos was able to identify witnesses who were at the scene and interview them. One witness was D.D. She told Detective Castellanos that she "came with the suspect [to the scene] and left with the suspect." D.D. identified Dae Dae in the surveillance video and told Detective Castellanos that Dae Dae was D.T. She told Detective Castellanos that she observed D.T. "to be the shooter." D.D. said that D.T. was "known to have people meet up at the apartment complex . . . where she lives to set up people for robberies." She described one robbery during which D.T. took the victim's shoes.

Detective Castellanos learned where D.T. attended high school. He showed a still image of the assailant from the surveillance video to the high school's resource officer, who identified D.T. as the person in the image.

D.T. voluntarily spoke with Detective Castellanos on May 10, 2023, at D.T.'s residence. D.T. admitted that he was at the shooting scene and identified himself as the person wearing the light-blue hoodie. He said that he heard the shots but did not see anything. However, during the second interview, Detective Castellanos testified that D.T. "voluntarily confessed that he shot [Chiti]." D.T. told Detective

5

Castellanos that "he was meeting with [Chiti] to buy some THC pens." He said that "he was going to the passenger side of the vehicle, he got scared, pulled out a firearm and shot [Chiti] because he was reaching for something."

Detective Castellanos also testified about the aggravated robbery offense for which the juvenile court transferred D.T. to criminal court. He testified that the complainant, Angel Alvarez, "met with the suspects through an app called OfferUp, where they sell items like Facebook Marketplace." They agreed to meet at an apartment complex. When he arrived at the meeting place, Alvarez was "met by the suspects" and "robbed at gunpoint." Alvarez was physically unharmed, but his shoes and phone were taken. The robbery suspects were captured on surveillance video, and police recognized D.T. from the investigation of Chiti's murder.

The State called Officer J. Larios with the Houston Police Department's special victims unit to testify. She stated that on, May 25, 2021, a report was made to police that D.T. had sexually assaulted A.D., his younger cousin. A.D.'s mother reported that A.D. told her that D.T. had sexually assaulted her twice. Both incidents occurred at the home of D.T.'s paternal grandmother. A.D. reported that the first incident occurred at night on June 5, 2020, while everyone else in the home was asleep. She said that she was laying "on the couch or chair near or in the dining room, and [D.T.] was over her on top of her, rubbing his genitals on her genitals." At the time, A.D. was nine years old and D.T. was twelve. A.D. reported that the

6

second incident occurred on April 19, 2021, when A.D. was ten years old, and D.T. was thirteen. Officer Larios testified that A.D. reported that

> [A.D.] was asleep. [D.T.] woke her up and asked her to come to the dining room area with [him]. And from then, pulled her pants and undergarments down and tried to put the part that he uses to pee in the part that she uses to pee. She stated that she felt pain, and that she started trying to close her legs, and that she was able to step away, pulled her clothes back up, and just left.

The State also called Dr. Christin Smith, a psychologist with the Harris County Juvenile Probation Department, to testify about D.T.'s certification evaluation, which was admitted into evidence. The certification evaluation included results of a psychiatric evaluation by Dr. Linda Wittig and a psychological evaluation by Nicole Stanasolovich, a predoctoral intern. Dr. Smith testified that she supervised Stanasolovich in conducting the evaluation. Both evaluations were conducted in February 2024 when D.T. was in a juvenile detention facility.

The certification evaluation stated that D.T. had lived with his parents until he was about three years old. Since that age, he had lived with his paternal grandmother (Grandmother). D.T.'s father lived with them at times, but D.T. no longer had a relationship with his mother.

The certification evaluation addressed D.T.'s educational history, noting that D.T. "described being suspended 'many times' in elementary school and two to three times in middle school for fighting." Because of his "negative behaviors" and association with "a negative peer group," D.T. went to live with his aunt in Virginia

7

from July 2021 until January 2023. While in Virginia, D.T.'s grades improved, and he was on the honor roll. When he returned to Houston, D.T. "gravitated to a negative peer group," who "used substances and carried firearms." Grandmother reported that D.T. "began to get into trouble when he met these individuals and described him as a 'follower.'" His behavior "escalated to more delinquent-styled behaviors (e.g., truancy, smoking marijuana, alleged offenses)," and he participated in a "couple" of fights while in high school. D.T.'s grades also declined, and he "failed the ninth grade due to unexcused absences." At the time of the evaluation, D.T. was attending school in juvenile detention where he was doing well, making As and Bs.

The evaluation noted that D.T. had received twenty-two infractions at the detention facility. The "majority of these infractions centered on 'horse playing' and being disrespectful towards staff," but also included refusing to attend school, destroying county property, and physically assaulting another juvenile.

The certification evaluation also showed that D.T. was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) at a young age. D.T. was prescribed medication for his ADHD but had been non-complainant with taking it over the years. D.T. and Grandmother attributed the fluctuation in his grades to his medication non-compliance, which had resulted in "behavioral difficulties."

8

The certification evaluation reflected that the psychological evaluation consisted of numerous tests, including a Risk Sophistication Treatment Inventory (RSTI), used to assess juvenile offenders in the areas of risk of dangerousness, sophistication and maturity, and amenability to treatment. Based on the results of the RSTI and cognitive and clinical assessments, Stanasolovich determined that, when the index offenses—that is, the aggravated robbery and murder offenses—are excluded and included, D.T. exhibited a below-average level of intellectual-based and criminal sophistication in comparison to other adolescent offenders. Stanasolovich also determined that D.T. exhibited a below-average level of maturity when the index offenses are excluded and included. Cognitive testing showed that D.T. has an IQ of 79, which "falls in the Very Low range compared to same-aged peers, which tends to indicate a slower maturation rate."

In her psychiatric evaluation, Dr. Wittig asked D.T. various questions to assess D.T.'s understanding of the charges against him, his knowledge of the proceedings, and his ability to assist in his own defense. She concluded that D.T. "ha[d] the ability to consult with his lawyer with a reasonable degree of rational understanding" and "showed a factual as well as rational understanding of the court proceedings he faces." She deemed D.T. "competent and fit to proceed."

Stanasolovich also assessed D.T.'s risk for dangerousness, concluding that it was below average when the index offenses are excluded. But, when the index

9

offenses are included, Stanasolovich concluded that D.T.'s risk of dangerousness increased to a moderate level. She assessed D.T.'s risk of violent reoffending to be a moderate risk when the index offenses are excluded and included. She explained:

> [D.T.] has several social and contextual risk factors that are noteworthy and can increase his risk for future violence. [D.T.'s] association with delinquent peers is considered a critical risk factor and particularly concerning for a number of reasons (e.g., tendency to conform his behavior to others, easily influenced, passivity). In addition, [D.T.'s] exposure to community disorganization (i.e., high rates of crime, violence) is considered a critical risk factor. His last identified critical risk factor is stress and coping as [D.T.] has a history of trauma (e.g., loss, parental rejection) and has demonstrated minimal positive coping habits.

Stanasolovich further noted that D.T. "has several noteworthy individual and clinical risk factors, which can increase his risk for future violence." These included "history of marijuana use" and "difficulties with anger management, namely in response to conflict." D.T. also has a "tendency towards impulsivity and acting without consideration of consequences." She explained that D.T.'s "long-standing history of intermittent medication non-compliance is particularly concerning" because Grandmother "reported an increase in behavioral problems" when he failed to take his ADHD medication.

Stanasolovich opined that, based "[on] the results derived from the clinical and forensic assessments, record review, and the narrative assessment of [D.T.'s] level of Treatment Amenability," D.T. "present[ed] at a below average level of Treatment Amenability when compared to most juvenile offenders his age. This is

10

true for when the offenses are excluded and included." (Emphasis omitted.) She observed that, while D.T. "has expressed some positive attitude towards future therapeutic services, he has exhibited low interest and motivation for services throughout his detainment." She noted that D.T. "made statements reflecting moderate impairment in experiencing empathy and remorse."

The certification evaluation also explained that, when D.T. was living with his aunt in Virginia, the aunt was informed that "charges would be file[d] against [D.T.]" for sexually assaulting A.D. unless D.T. participated in a sexual assault therapy program. D.T. was approved to participate in a program in Virginia, but, because he did not attend the program, the aggravated sexual assault offenses were referred to the juvenile justice system.

After the State rested, D.T. called Grandmother to testify. She disputed some of the facts underlying A.D.'s claim that D.T. sexually assaulted her twice at Grandmother's home. Grandmother testified that, when A.D. stayed at her home, A.D. slept with her in her bedroom. In short, Grandmother indicated that there had been no opportunity for D.T. to abuse A.D. while staying in her home.

At the end of the transfer hearing, the juvenile court ruled in the State's favor. The court signed orders waiving its jurisdiction and transferring D.T. to criminal district court for prosecution as an adult. In each order, the juvenile court found that D.T.—who was born in November 2007—was over the age of fourteen at the time

11

of the offense; he had been charged with a felony-grade offense; there had been no adjudication of the offense; and there was probable cause to believe that D.T. had committed the charged offense.

For each case, the juvenile court determined that "the welfare of the community require[d] criminal proceedings" due to the seriousness of each offense and D.T.'s conduct during it. The court also determined that D.T.'s background "necessitate[d] transfer to criminal district court for the welfare of the community." The court explained that, in making the determinations, it had "considered among other matters" whether:

(1) the offense was against person or property, and it gave greater weight in favor of waiver to this offense which was committed against the person of another;

(2) the sophistication and maturity of [D.T.];

(3) the record and previous history of [D.T.]; and

(4) the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use of procedures, services and facilities currently available to the Juvenile Court.

D.T. now appeals the transfer orders. *See* TEX. FAM. CODE § 56.01(c)(1)(A) (permitting appeal from orders entered under Family Code section 54.02 "respecting transfer of the child for prosecution as an adult").

12

**Waiving Jurisdiction and Transferring D.T. to Criminal Court**

In his two appellate issues, D.T. challenges the legal and factual sufficiency of the evidence supporting the findings in the juvenile court's transfer orders.

## A.    Applicable Legal Principles

Texas juvenile courts have exclusive original jurisdiction over cases involving what otherwise would be criminal conduct by children ten or older but younger than seventeen. *See* TEX. FAM. CODE §§ 51.02(2), 51.03(a), 51.04(a). But the right of a juvenile offender to remain outside the jurisdiction of the criminal district court is not absolute. *Ex parte Arango*, 518 S.W.3d 916, 920 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). A juvenile court may, after an evidentiary hearing, waive its exclusive original jurisdiction and transfer a child to an appropriate criminal district court for criminal proceedings if certain conditions are met. *See* TEX. FAM. CODE § 54.02(a), (c). Those conditions are set out in Family Code section 54.02(a). Under that provision, a juvenile court may waive its exclusive original jurisdiction and transfer a child to criminal court for criminal proceedings if:

> (1) the child is alleged to have violated a penal law of the grade of felony;
>
> (2) the child was:
>
>> (A) 14 years of age or older at the time he is alleged to have committed the offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; and

. . .

(3) after full investigation and hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense or the background of the child the welfare of the community requires criminal proceedings.

*Id.* § 54.02(a).

The State has the burden to persuade the juvenile court by a preponderance of the evidence that the community's welfare requires the transfer, either because of the seriousness of the offense or the child's background, or both. *Bell v. State*, 649 S.W.3d 867, 886 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). In making this determination, the juvenile court must "consider, among other matters," the following four factors:

(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2) the sophistication and maturity of the child;

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

TEX. FAM. CODE § 54.02(f).

These factors are non-exclusive and assist the juvenile court in balancing the juvenile offender's potential danger with his "amenability to treatment." *Bell*, 649

14

S.W.3d at 886 (quoting *In re C.O.*, No. 02-21-00235-CV, 2021 WL 5933796, at *5 (Tex. App.—Fort Worth Dec. 16, 2021, pet. denied) (mem. op.)). Any combination of these factors may suffice to support a waiver of the juvenile court's exclusive original jurisdiction and not every factor need weigh in favor of transfer to the criminal district court. *Id.*; *see In re K.M.*, No. 01-20-00121-CV, 2020 WL 4210493, at *8 (Tex. App.—Houston [1st Dist.] July 23, 2020, no pet.) (mem. op.) ("All four of the section 54.02(f) criteria need not weigh in favor of transfer for a juvenile court to waive its jurisdiction."). "The juvenile court is not required to find that the evidence establishes each factor, nor does it need to consider other factors." *In re M.F.M.*, No. 13-23-00456-CV, 2024 WL 484695, at *8 (Tex. App.—Corpus Christi–Edinburg Feb. 8, 2024, pet. denied) (mem. op.) (citing *Ex parte Thomas*, 623 S.W.3d 370 (Tex. Crim. App. 2021)).

We review a juvenile court's decision to waive its exclusive original jurisdiction and transfer a child to criminal court using two steps. *Bell*, 649 S.W.3d at 887. First, we review the juvenile court's findings using the traditional evidentiary sufficiency review. *Id.* In reviewing legal sufficiency, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *Id.* If more than a scintilla of evidence supports the finding, the no-evidence challenge fails. *Id.* In reviewing factual sufficiency, we consider all evidence presented to determine if the court's findings are against the

great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Id.*

If the juvenile court's findings are supported by sufficient evidence, then we move to the second step—reviewing "the ultimate waiver decision" for an abuse of discretion. *Id.* A court abuses its discretion if it acts without reference to any guiding rules and principles. *Id.* (citing *In re Nat'l Lloyds Ins.*, 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding)). "A juvenile court abuses its discretion when its transfer decision is essentially arbitrary, given the evidence upon which it was based." *Id.* However, "a waiver decision representing a reasonably principled application of the legislative criteria generally will pass muster under the abuse-of-discretion standard of review." *Id.* (internal quotations omitted).

## B.    Analysis

As an initial matter, D.T. argues that the juvenile court's transfer orders are deficient because they are "conclusory." D.T. asserts that the juvenile court "made no real written findings." He complains that the order "was not specific at all as to [D.T.], but simply repeated [the language of] the statute." He asserts that was "not enough."

We disagree with D.T.'s characterization of the juvenile court's orders and of what the law requires. Family Code subsection 54.02(h) provides that, "[i]f the juvenile court waives jurisdiction, it shall state specifically in the order its reasons

16

for waiver." TEX. FAM. CODE § 54.02(h). D.T. appears to read this requirement to mean that an order waiving jurisdiction must contain case-specific fact-findings to support the reasons for the waiver. However, the Court of Criminal Appeals has rejected this view, clarifying that case-specific fact-findings "are not required by the text of the statute or constitutional precedent." *Thomas*, 623 S.W.3d at 381. "A juvenile transfer order entered after the required transfer hearing and complying with the statutory requirements constitutes a valid waiver of jurisdiction even if the transfer order does not contain factually-supported, case-specific findings." *Id.* at 383; *see In re M.S.*, No. 01-21-00374-CV, 2022 WL 17981563, at *6 (Tex. App.— Houston [1st Dist.] Dec. 29, 2022, no pet.) (mem. op.) (rejecting appellant's argument that court was required to make case-specific findings in transfer order).

Here, the juvenile court's orders complied with the requirements of section 54.02 by identifying the reasons for D.T.'s transfer to criminal court. *See* TEX. FAM. CODE § 54.02(h). The orders state that D.T. was charged with a felony-grade offense; he was over the age of fourteen at the time of the offenses; there had been no adjudication of the offenses; and there was probable cause to believe that D.T. had committed the charged offenses. *See id.* § 54.02(a). The orders state that the juvenile court determined that the community's welfare required D.T.'s transfer to criminal court due to the seriousness of the offenses and D.T.'s background. *See id.* The orders indicate that, in making this determination, the juvenile court considered

17

the four factors listed in subsection 54.02(f): (1) that the offenses were against a person; (2) D.T.'s sophistication and maturity; (3) D.T.'s previous record and history; and (4) "the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use of procedures, services and facilities currently available to the Juvenile Court." *See id.* § 54.02(f).

D.T. contends that, considering the four factors, the evidence is legally and factually insufficient to support the juvenile court's findings that the welfare of the community requires D.T.'s transfer to criminal court due to the seriousness of the alleged offenses and D.T.'s background.[2] *See id.* § 54.02(a)(3), (f). We disagree.

As the juvenile court indicated, the first factor weighs in favor of transfer because D.T. is charged with offenses against a person, namely murder and aggravated robbery. *See id.* § 54.02(f)(1); *Rodriguez v. State*, 478 S.W.3d 783, 787 (Tex. App.—San Antonio 2015, pet. ref'd) ("This was an offense against the person and as such should be given greater weight in favor of transfer."). Murder and aggravated robbery are first-degree felonies and serious offenses against a person. *See* TEX. PENAL CODE §§ 12.04(a) ("Classification of Felonies"), 19.02(c) (murder is first-degree felony offense), 29.03(b) (aggravated robbery is first-degree felony offense). D.T.'s alleged use of a firearm to commit both offenses heightened the

---

[2] D.T. does not challenge the juvenile court's findings that there was probable cause to believe that he committed the charged offenses of aggravated robbery and murder.

seriousness of the offenses. *See In re T.C.*, No. 06-21-00075-CV, 2022 WL 398419, at \*4 (Tex. App.—Texarkana Feb. 10, 2022, no pet.) (mem. op.) (concluding that first factor weighed in favor of transfer where alleged offense committed against person and involved firearm).

D.T.'s conduct when committing the offenses also highlights the seriousness of the offenses. As to the murder offense, the evidence showed that, when D.T. met with Chiti for the marijuana sale, D.T. shot Chiti in the head. Surveillance video captured the events surrounding the shooting, and D.T. was identified as the assailant in the video. D.D., an eyewitness to the shooting, told Detective Castellanos that she saw D.T. shoot Chiti, and D.T. confessed to the shooting. As to the aggravated robbery offense, the evidence showed that D.T. and Alvarez corresponded through a mobile app used for buying and selling goods. They agreed to meet to engage in a transaction. When Alvarez arrived at the agreed location, D.T. pointed a gun at him and stole his shoes and phone. *See In re Z.M.*, No. 02-21-00213-CV, 2021 WL 4898851, at \*5 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.) (recognizing that "[t]he nature and seriousness of the specific alleged offense, alone, may justify the juvenile court's waiver of jurisdiction notwithstanding other section 54.02(f) factors, so long as the offense: (1) is substantiated by evidence at the transfer hearing, and (2) is of sufficiently egregious character" (internal quotation marks omitted)).

D.T. points out that Detective Castellanos testified that D.T. told him that he shot Chiti because he believed that Chiti was reaching for "something." D.T. suggests that he has a self-defense claim that weighs against the juvenile court's transfer decision. However, "[w]hether a justification defense is warranted is a fact question to be resolved by a trial on the merits or an adjudication, not at a preliminary hearing," such as a section 54.02 transfer hearing. *See In re D.L.T.*, No. 07-22-00277-CV, 2023 WL 320009, at *4 (Tex. App.—Amarillo Jan. 19, 2023, pet. denied) (mem. op.). A transfer hearing does not serve the purpose of determining guilt or innocence; rather, "it is only for the purpose of determining if the welfare of the community would be best served by juvenile proceedings or by criminal proceedings." *J.D.P. v. State*, 609 S.W.2d 868, 870 (Tex. Civ. App.—Texarkana 1980, no writ). Thus, evidence of D.T.'s claim of self-defense does not diminish the weight of the murder charge under the first factor.

We turn to the evidence relevant to the second factor: D.T.'s sophistication and maturity. *See* TEX. FAM. CODE § 54.02(f)(2). In the certification evaluation, the evaluator, Stanasolovich, concluded that, when the index offenses are excluded and included, D.T. exhibited a below-average level of intellectual-based and criminal sophistication in comparison to other adolescent offenders. Stanasolovich also concluded that D.T. exhibited a below-average level of maturity when the index offenses are excluded and included. On appeal, D.T. contends this factor weighs

20

against transfer because cognitive testing showed that he has an IQ of 79. The evaluation states that an IQ of 79 "falls in the Very Low range compared to same-aged peers, which tends to indicate a slower maturation rate." Although relevant, "this evidence is not necessarily determinative of [D.T.'s] sophistication and maturity." *See In re M.B.*, No. 14-23-00969-CV, 2024 WL 3041398, at *6 (Tex. App.—Houston [14th Dist.] June 18, 2024, no pet.) (mem. op.). (citing *Bell*, 649 S.W.3d at 893).

"In assessing the sophistication and maturity of the child, the juvenile court places emphasis on whether the evidence shows that the child knew right from wrong and could assist his attorney in his defense." *Bell*, 649 S.W.3d at 892. "Evidence that the child understands the seriousness of the charge against him as well as the proceedings support a juvenile court's finding that the child's sophistication and maturity weigh in favor of transfer." *Id.* at 893; *see In re K.J.*, 493 S.W.3d 140, 151 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("In assessing maturity and sophistication, courts place weight on whether there is evidence indicating that the juvenile does not know right from wrong.").

Dr. Wittig interviewed D.T. to determine his understanding of the charges against him, his knowledge of the proceedings, and his ability to assist in his own defense. The certification evaluation reflects that D.T. was aware that he was charged with aggravated robbery and murder. D.T. described aggravated robbery as

21

"taking something from someone" and acknowledged that "the aggravated part of the term" implied "the use of force or a weapon." He stated that a murder "involve[d] someone ending up dead." When asked about the possible consequences of those offenses, D.T. "mentioned getting life in prison."

D.T. stated that he knew that he was being "considered for certification" and knew the date of the certification hearing. When asked what "certification" meant, D.T. stated that it meant he would be "charged as an adult and 'the case [was] going across the street'" to be prosecuted in "the adult system." And, if he was not certified, "his case would stay in the juvenile system." D.T. said that he wanted "to stay in the juvenile system because [he] would not get as much time as in the adult system." When asked, "he stated that a juvenile can get up to 40 years."

D.T.'s responses also indicated that he was familiar with the roles in the courtroom of his attorney, the prosecutor, the judge, the jury, and witnesses. "When asked what he should do with regard to speaking with his lawyer, [D.T.] stated he should tell the truth." D.T. then demonstrated that he knew the difference between a true and an untrue statement by giving examples of each.

Dr. Wittig concluded that D.T. "ha[d] the ability to consult with his lawyer with a reasonable degree of rational understanding" and "showed a factual as well as rational understanding of the court proceedings he faces." She stated that in her professional opinion D.T. "can be deemed competent and fit to proceed."

The certification evaluation also noted that "[D.T.'s] grades have fluctuated throughout his academic history." D.T. and Grandmother attributed the fluctuation to his non-compliance with his ADHD medication. When he lived with his aunt in Virginia for nearly two years, D.T. did well in school, making the honor roll. When he returned to Houston, D.T.'s grades decreased "due to exposure to negative influences." D.T. "failed the ninth grade due to unexcused absences." At the time of the evaluation, D.T. was attending school while in juvenile detention where he was doing well, making As and Bs.

Evidence that the juvenile is not intellectually disabled, is capable of understanding the proceedings against him, could assist attorneys in his defense, and is intellectually capable of distinguishing right from wrong are all relevant to a determination of the juvenile's maturity and sophistication to support upholding the juvenile court's transfer decision. *See Bell*, 649 S.W.3d at 893–94 (collecting cases). How to weigh the evidence is within the juvenile court's discretion. *Id.* at 893. Here, there was evidence that D.T. had below average maturity and intellect, but there was also evidence that he could succeed academically, could assist his counsel in his defense, understood the difference between the juvenile and adult systems, and understood the seriousness of the charges against him. Considering all the evidence, the juvenile court could have reasonably determined that the third factor—D.T.'s sophistication and maturity—weighed in favor of finding that D.T. should be

23

transferred to criminal court for the welfare of the community. *See* TEX. FAM. CODE § 54.02(a)(3), (f)(2); *Bell*, 649 S.W.3d at 893 (concluding that sophistication and maturity factor could weigh in favor of transfer decision even though child was "functioning well below grade level" and had an "IQ of 78" when evidence showed child knew right from wrong and could assist attorney in his defense); *K.J.*, 493 S.W.3d at 151–52 (observing that there was evidence both supporting and not supporting finding of maturity and noting that "there need not be evidence in support of every section 54.02(f) factor weighing in favor of transfer, so long as there is sufficient evidence overall to justify the juvenile court's decision").

Relevant to the third factor—the juvenile's record and history—the evidence showed that D.T. had referrals to the juvenile system for two offenses of aggravated sexual assault of a child. *See* TEX. FAM. CODE § 54.02(f)(3). The offenses involved A.D., his younger cousin. A.D. was nine and ten years old and D.T. was twelve and thirteen, respectively, when the offenses occurred. A.D. had reported to her mother that, on two occasions, while staying overnight at Grandmother's home, D.T. had forced her to remove her clothing and to engage in sexual contact with him. Although unadjudicated, the aggravated sexual assault charges may be considered in determining whether D.T. should be transferred to criminal court.[3] *In re D.R.B.*, No.

---

[3] At the transfer hearing, Grandmother disputed some of the facts reported by A.D. related to the aggravated sexual assault allegations. The juvenile court, as the factfinder, was the sole judge of credibility and was free to disbelieve

24

01-16-00442-CV, 2016 WL 6873067, at *7 (Tex. App.—Houston [1st Dist.] Nov. 22, 2016, no pet.) (mem. op.) ("Section 54.02(f)(3) asks the court to consider the record and previous history of the child, but it does not limit the court to adjudicated delinquent behavior.").

The certification evaluation also reflected that D.T. "received 22 behavioral infractions while in detention." The "majority of these infractions centered on 'horse playing' and being disrespectful towards staff," but also included refusing to attend school, destroying county property, and physically assaulting another juvenile. In addition, the evaluation stated that D.T. reported being suspended from school "relatively often in the past . . . for fighting or being disrespectful." A "juvenile court may consider disciplinary measures taken by the child's school and rule infractions while the child is in the juvenile detention facility following the commission of the offense in determining whether the child's record and previous history weigh in favor of transfer." *Bell*, 649 S.W.3d at 895.

Finally, we review evidence relevant to the fourth factor: "the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court." TEX. FAM. CODE § 54.02(f)(4). When determining whether the protection of

Grandmother's testimony. *See In re T.S.*, 548 S.W.3d 711, 728 (Tex. App.— Houston [1st Dist.] 2018, no pet.).

25

the public and the likelihood of rehabilitation weigh in favor of transfer, "[t]he juvenile court may consider the serious nature of the offense committed by the child." *Bell*, 649 S.W.3d at 897. Here, the juvenile court found probable cause that D.T. committed the offenses of murder and aggravated robbery by using a firearm— findings that D.T. does not challenge on appeal. *See In re W.D.H.*, No. 14-17-00164-CV, 2017 WL 3090049, at *10 (Tex. App.—Houston [14th Dist.] July 20, 2017, no pet.) (noting, when considering fourth factor, that juvenile court had found probable cause that child "committed an aggravated robbery against a woman walking alone in a parking lot late at night"). As discussed, the State offered evidence substantiating the charges. The State also offered evidence that D.T. has two referrals to the juvenile system for the aggravated sexual assault of A.D., and the State offered evidence substantiating those charges as well.

In the certification evaluation, Stanasolovich assessed D.T.'s risk for dangerousness at a below-average level when the index offenses are excluded. But, when the index offenses are included, she concluded that D.T.'s risk of dangerousness increased to a moderate level. She assessed D.T.'s risk of violent reoffending to be a moderate risk when the index offenses are excluded and included. She explained that D.T. "has several social and contextual risk factors that are noteworthy and can increase his risk for future violence." The risk factors included D.T.'s "association with delinquent peers," which she found "particularly

26

concerning for a number of reasons (e.g., tendency to conform his behavior to others, easily influenced, passivity),” and D.T.’s “exposure to community disorganization (i.e., high rates of crime, violence).” She identified another risk factor as “stress and coping,” explaining that D.T. “has a history of trauma (e.g., loss, parental rejection) and has demonstrated minimal positive coping habits.”

Stanasolovich also noted that D.T. “has several noteworthy individual and clinical risk factors, which can increase his risk for future violence.” These included “history of marijuana use” and “difficulties with anger management, namely in response to conflict.” She observed that D.T. has a “tendency towards impulsivity and acting without consideration of consequences.” She explained that D.T.’s “long-standing history of intermittent medication non-compliance is particularly concerning” because Grandmother “reported an increase in behavioral problems” when D.T. failed to take his ADHD medication.

Regarding the likelihood of rehabilitation, Stanasolovich opined that D.T.’s level of treatment amenability was at a below-average level when the index offenses are excluded and included. Stanasolovich observed that, while D.T. “has expressed some positive attitude towards future therapeutic services, he has exhibited low interest and motivation for services throughout his detainment.” D.T. also “made statements reflecting moderate impairment in experiencing empathy and remorse.”

In addition, the evidence showed that, at the time of the transfer hearing, D.T. was sixteen years and five months old. *See Bell*, 649 S.W.3d at 896 (noting—in case where child was sixteen years and three months old at transfer hearing—that age of child is relevant when assessing likelihood of rehabilitation in juvenile system). And, as mentioned, the certification evaluation reflected that D.T. had been non-compliant with taking his ADHD medication, which resulted in behavioral issues. *See M.F.M.*, 2024 WL 484695, at *8 (citing evidence that child "was reluctant to take his prescribed medications, necessitating a heightened level of supervision" as evidence relevant to fourth factor).

D.T. asserts that he would benefit "from further school, structure, and therapy," which "would [not] be mandated" in the adult prison system. D.T. points out that he was doing well in school while in juvenile detention. However, given the evidence of his low amenability to treatment, his "low interest and motivation for services," his age, and his non-compliance with taking his medication, the juvenile court could have reasonably inferred that D.T.'s likelihood of rehabilitation in the juvenile system was low. *See* TEX. FAM. CODE § 54.02(f)(4).

Based on the record, we conclude that there is more than a scintilla of evidence supporting the juvenile court's findings that the welfare of the community requires D.T.'s transfer to criminal court due to the seriousness of the alleged offenses and D.T.'s background, and the great weight and preponderance of the evidence is not

28

to the contrary. *See id.* § 54.02(a)(3), (f); *Bell*, 649 S.W.3d at 887. Accordingly, we hold that the evidence was legally and factually sufficient to support the findings.

D.T. offers no argument that the juvenile court abused its discretion in its "ultimate waiver decision"—the second step in an appellate court's review of a waiver and transfer order. *See Bell*, 649 S.W.3d at 887. But, even if D.T.'s brief could be read to raise that argument, the record does not show that the juvenile court acted without reference to the guiding rules and principles by waiving its jurisdiction and transferring D.T. to criminal court. *See Thomas*, 623 S.W.3d at 380 (recognizing that juvenile courts have substantial discretion in making transfer decision).

We overrule D.T.'s first and second issues in each appeal.

## Conclusion

We affirm the orders of the juvenile court waiving its exclusive original jurisdiction and transferring D.T. to criminal district court.

Kristin Guiney
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.